[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 25, 2011
JOHN LEY
CLERK

_____

No. 06-11582

_____

D. C. Docket No. 04-02608-CV-WSD-1

COMMUNITY STATE BANK,
CASH AMERICA FINANCIAL SERVICES, INC.,
CASH AMERICA INTERNATIONAL, INC.,
GEORGIA CASH AMERICA, INC.,
DANIEL R. FEEHAN,

Petitioners-Appellants,

versus

JAMES E. STRONG,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 25, 2011)

Before CARNES and MARCUS, Circuit Judges, and JORDAN,[*] District Judge.

MARCUS, Circuit Judge:

_____

[*] Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

This resilient case has arrived back in our Court after the Supreme Court's opinion in <u>Vaden v. Discover Bank</u>, 556 U.S. 49, 129 S. Ct. 1262 (2009), and following a detour through our <u>en banc</u> Court. Again we are asked to navigate the labyrinth of federal jurisdiction to determine whether the district court had jurisdiction to entertain a petition to compel arbitration, pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4.

The case arose when the Respondent James Strong ("Strong") obtained a month-long $200 loan from a storefront in Georgia in 2004. Strong later sought relief from a Georgia state court, arguing that the loan was illegal and usurious under Georgia law, because it carried a finance charge of $36, equivalent to an annual percentage rate of 253%. The Petitioners in this case, Community State Bank, Cash America Financial Services, Inc., Cash America International, Inc., Georgia Cash America, Inc., and Daniel Feehan, counter that the loan was perfectly legal, because federal law permits Community State Bank to charge interest rates without regard to Georgia law. The only issue on appeal is jurisdictional: whether the federal district court has jurisdiction over the petition to compel arbitration of Strong's claims.

In our first opinion in this case, we held that in order to determine whether there is federal jurisdiction over a petition to compel arbitration under § 4 of the

FAA, we must "look through" the arbitration petition to the underlying controversy and ask whether the underlying dispute between the parties would have arisen under federal law. Cmty. State Bank v. Strong ("Strong I"), 485 F.3d 597, 607 (11th Cir. 2007). We concluded that, looking through the § 4 arbitration petition to the underlying controversy, it was apparent that Strong could have filed a coercive action arising under federal law, and therefore the district court had subject matter jurisdiction over the petition to compel arbitration. Id. at 612. Subsequently, this Court vacated Strong I to review the case en banc, Cmty. State Bank v. Strong, 508 F.3d 576 (11th Cir. 2007), but stayed its en banc proceedings to await the Supreme Court's decision in Vaden, which raised a substantially similar jurisdictional question.

In Vaden, the Supreme Court adopted the "look through" approach for determining federal jurisdiction over FAA § 4 arbitration petitions, holding that "[a] federal court may 'look through' a § 4 petition and order arbitration if, 'save for [the arbitration] agreement,' the court would have jurisdiction over 'the [substantive] controversy between the parties.'" Vaden, 129 S. Ct. at 1268 (quoting 9 U.S.C. § 4) (alterations in Vaden). In light of Vaden, this Court vacated its en banc order and remanded the case back to the panel. Cmty. State Bank v. Strong, 565 F.3d 1305, 1306 (11th Cir. 2009).

3

We now revisit the same question we faced in Strong I, with the benefit of the Supreme Court's guidance in Vaden. Following Vaden's instruction to "look through" the FAA § 4 petition to the substantive controversy between the parties, we remain convinced that Strong's dispute with Community State Bank ("the Bank") could have arisen under federal law and, therefore, provides a basis for federal jurisdiction over the FAA petition. We therefore continue to endorse the primary thrust of the Strong I holding with respect to the Bank, and conclude that the district court has jurisdiction over the Bank's § 4 petition.

However, we depart from our result in Strong I as to the other petitioners in the case -- Cash America Financial Services, Inc., Cash America International, Inc., Georgia Cash America, Inc., and Daniel R. Feehan (collectively "Cash America"). During the long pendency of this appeal, the Cash America parties -- who were defendants in a parallel state-court lawsuit brought by Strong -- moved to compel arbitration of Strong's claims in state court. Yet, when the state court ordered Cash America to produce discovery on the limited issue of the enforceability of the arbitration agreement between the parties, Cash America repeatedly refused to comply with the state court's orders. Ultimately, the state court struck Cash America's arbitration defenses as a statutorily authorized sanction for its willful discovery abuses. We now conclude that this state-court

4

judgment -- which has since been upheld on appeal and now constitutes a final judgment from a court of competent jurisdiction -- has preclusive effect, and Cash America is collaterally estopped from petitioning the district court to decide the very same issue that the state court has already decided against it. We, therefore, affirm the district court's dismissal of the FAA petition as to all of the petitioners who were defendants in the state-court lawsuit. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

The essential facts and procedural history are these.[1] On February 6, 2004, James Strong took out a "payday loan" of $200 at a store called Cash America Pawn of Atlanta #15, located in Cobb County, Georgia. The store was operated by Georgia Cash America, Inc., an affiliate of Cash America Financial Services, Inc. "'Payday loans' are generally small-dollar, short-term, high interest loans secured by a check given to the payday lender in the amount of the cash advance plus interest." Dale v. Comcast Corp., 498 F.3d 1216, 1221 n.9 (11th Cir. 2007). Banks that provide payday loans generally partner with local institutions to "market" or "service" the small loans.

In exchange for the $200 loan, Strong signed a loan agreement, styled as a

---

[1] A fuller explication of the facts and procedural history is laid out in Strong I, 485 F.3d at 601-05.

5

promissory note, that required payment of "the principal sum of $200.00, plus a finance charge in the amount of $36.00" by March 3, 2004. The finance charge of $36 for the one month of the loan is equivalent to an annual percentage rate of 253%. Although the loan document identified the "Lender" as Community State Bank, chartered in Milbank, South Dakota, and stated that payment should be made "to the order of COMMUNITY STATE BANK," it permitted Strong to make his payment in person to the Cash America Pawn of Atlanta #15 store in Georgia -- the same place he had obtained the loan.

In a provision under the heading, "Cash America," the loan agreement stated that "Lender [the Bank] has entered into a contract with Cash America Financial Services, Inc. to assist with this loan transaction. Neither Cash America Financial Services, Inc., nor any of its affiliates (collectively, 'Cash America'), is owned by, operated by, or affiliated with Lender." The loan agreement also contained an arbitration clause. Strong agreed that "[a]ny controversy or claim between me and the Lender, Cash America, or any employees . . . arising out of or in any way relating to this Note and my loan relationship with Lender (including this arbitration agreement) shall be settled by binding arbitration."

On August 6, 2004, Strong filed a lawsuit against Georgia Cash America, Inc., Cash America International, Inc., and Daniel Feehan, the CEO of both

6

companies (collectively, the "Cash America defendants"), in the State Court of Cobb County, in Georgia, alleging that the payday loans made to him and others he purported to represent were illegal and usurious under Georgia law. Strong sought to cast his suit as a class action on behalf of "hundreds, if not thousands" of similarly situated borrowers. Among other claims, Strong alleged that the Cash America defendants violated the Georgia usury statute, Ga. Code Ann. § 7-4-1 et seq., by charging more than 16% per annum on a loan of $3,000 or less, id. § 7-4-2(a)(2),[2] or more than 5% per month on a loan of any sum, id. § 7-4-18,[3]; the Georgia Industrial Loan Act, Ga. Code Ann. § 7-3-1 et seq., by failing to be licensed under the statute, id. § 7-3-8,[4] and charging more than 10% per annum

---

[2] Georgia's usury statute provides:

Where the principal amount involved is $3,000.00 or less, [the legal rate of interest] shall not exceed 16 percent per annum simple interest on any loan, advance, or forbearance to enforce the collection of any sum of money unless the loan, advance, or forbearance to enforce the collection of any sum of money is made pursuant to another law.

Ga. Code Ann. § 7-4-2(a)(2).

[3] Georgia's usury statute makes charging a 5% per month interest rate a misdemeanor, providing that "[a]ny person, company, or corporation who shall reserve, charge, or take for any loan or advance of money . . . any rate of interest greater than 5 percent per month, either directly or indirectly, . . . by any . . . device whatsoever shall be guilty of a misdemeanor." Ga. Code Ann. § 7-4-18(a).

[4] The Georgia Industrial Loan Act's licensing provision states that "[a]ll persons engaged in the business of making loans of $3,000.00 or less in the State of Georgia, unless expressly exempted therefrom, shall be required to obtain a license under this chapter." Id. § 7-3-8.

7

plus an 8% loan fee on a loan of $3,000 or less, id. § 7-3-14[5]; and Georgia's

Racketeer Influenced and Corrupt Organizations statute ("Georgia RICO"), Ga.

Code Ann. § 16-14-1 et seq., by conducting an enterprise through a pattern of

racketeering activity, to wit, payday lending violations, see id. § 16-14-

3(9)(A)(xxxviii).[6]  In an obvious effort to avoid federal jurisdiction, Strong did not

sue Community State Bank, and expressly stated in the complaint that he and the

putative class members did "not assert any claims under the laws of the United

States," did "not assert any claim against a state or nationally chartered bank," and

did "not seek recovery . . . in excess of $75,000."

On August 31, 2004, the Cash America defendants -- together with

Community State Bank -- served a Notice of Intent to Arbitrate on Strong.  Class

counsel for Strong rejected the Notice, and informed the Bank and the Cash

America defendants that Strong intended to go forward in state court with his state-

---

[5] The Georgia Industrial Loan Act prohibits licensees from charging interest at a rate that "exceed[s] 10 percent per annum of the face amount of the contract, whether repayable in one single payment or repayable in monthly or other periodic installments," id. § 7-3-14(1); however, it permits licensees to charge "[i]n addition thereto," a loan fee in "an amount not greater than 8 percent of the first $600.00 of the face amount of the contract plus 4 percent of the excess." Id. § 7-3-14(2).

[6] We note in passing, however, that although the Georgia RICO statute includes violations of the Payday Lending statute, Ga. Code Ann. § 16-17-2, as predicate "racketeering activity," see id. § 16-14-3(9)(A)(xxxviii), this Payday Lending statute was not in effect at the time of Strong's loan on February 6, 2004.  See 2004 Ga. Laws Act 440 (S.B. 157) (eff. May 1, 2004) (codified in relevant part at Ga. Code Ann. § 16-17-1, et seq.).  Moreover, violations of Georgia's usury statute, Ga. Code Ann. § 7-4-1, et seq., are not listed as qualifying "racketeering activity" in the Georgia RICO statute.  See id. § 16-14-3(9)(A).

law-grounded claims. On September 7, 2004, despite the complaint's having expressly disavowed any intention to sue the Bank or to assert any federal claims, the Cash America defendants removed Strong's state-court lawsuit to the United States District Court for the Northern District of Georgia. On the same day, the Cash America defendants -- together with the Bank and Cash America Financial Services, Inc. -- commenced an independent action against Strong by filing a Verified Petition to Compel Arbitration and Stay Judicial Proceedings in the same federal district court, seeking to compel arbitration of Strong's claims pursuant to § 4 of the FAA.[7] The Petitioners argued that the district court had jurisdiction to entertain the petition because Strong's state-law usury claims were completely

---

[7] Section 4 of the FAA permits an "aggrieved" party to petition a federal court to compel arbitration pursuant to a party's written agreement:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

9 U.S.C. § 4.

Section 2 of the FAA -- the Act's "centerpiece provision," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985) -- provides that covered arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

preempted by Section 27(a) of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d(a).[8] Strong moved the district court to dismiss the arbitration petition for lack of subject matter jurisdiction and to remand the state-court action back to state court, similarly for lack of federal jurisdiction. On December 13, 2005, the district court granted Strong's motion to remand the state case, agreeing with Strong that federal jurisdiction was lacking. On February 7, 2006, the district court also granted Strong's motion to dismiss the Verified Petition, rejecting the Petitioners' asserted bases of federal jurisdiction. The Petitioners timely appealed to this Court the dismissal of the arbitration petition.

The case has since taken a circuitous route. On April 27, 2007, a panel of this Court reversed the district court's dismissal and held that, looking through the § 4 arbitration petition to the underlying controversy, it was apparent that Strong

---

[8] Section 27 of the FDIA was drafted as Section 521 in Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub. L. No. 96-221, § 521, 94 Stat. 132 (1980) (codified at 12 U.S.C. § 1831d). Section 27(a) of the FDIA provides, in relevant part:

> In order to prevent discrimination against State-chartered insured depository institutions . . . with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank . . . would be permitted to charge in the absence of this subsection, such State bank . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, . . . charge on any loan . . . interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank . . . or at the rate allowed by the laws of the State . . . where the bank is located, whichever may be greater.

12 U.S.C. § 1831d(a).

10

could have filed a coercive action arising under federal law, and therefore the district court had federal jurisdiction over the petition to compel arbitration. Strong I, 485 F.3d at 612. Strong petitioned for rehearing en banc. On September 10, 2007, the full Court granted his petition, Cmty. State Bank v. Strong, 508 F.3d 576, and heard argument on February 26, 2008. However, before this Court could render its decision in the en banc case, the Supreme Court granted certiorari in a case raising similar jurisdictional issues arising out of the Fourth Circuit in Discover Bank v. Vaden, 396 F.3d 366 (4th Cir. 2005). See Vaden v. Discover Bank, 552 U.S. 1256 (2008) (granting cert.). We stayed further proceedings, awaiting the Supreme Court's decision. After the Supreme Court rendered its decision in Vaden, 129 S. Ct. 1262, this Court vacated its en banc order and remanded this case back to the panel. Cmty. State Bank v. Strong, 565 F.3d at 1306.

## II.

For purposes of this opinion, we have divided the Petitioners into two distinct groups, because our judgment differs as to each group: (1) Community State Bank, and (2) all Cash America affiliates and their CEO, Daniel Feehan (collectively, "Cash America"). In this Part, we address the issue of whether there is federal jurisdiction over the Bank's petition to compel arbitration, under 28

11

U.S.C. § 1331. And then, in Part III, we address the parallel question of whether there is federal jurisdiction over Cash America's petition to compel arbitration, under 28 U.S.C. § 1331. We review the district court's determination of its subject matter jurisdiction de novo. Asociacion de Empleados del Area Canalera (ASEDAC) v. Pan. Canal Comm'n, 453 F.3d 1309, 1313 (11th Cir. 2006).

A.

Title 28 of the United States Code grants federal district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The test ordinarily applied for determining whether a claim arises under federal law is whether a federal question appears on the face of the plaintiff's well-pleaded complaint. Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152 (1908). "As a general rule, a case arises under federal law only if it is federal law that creates the cause of action." Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th Cir. 1996) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 8-10 (1983)).

The FAA provides that when one party to an arbitration agreement is "aggrieved" by another's resistance to arbitration, the aggrieved party may petition for an order compelling arbitration in "any United States district court which, save for such agreement, would have jurisdiction under Title 28 . . . of the subject

12

matter of a suit arising out of the controversy between the parties." 9 U.S.C. § 4.

It is a long-accepted principle that the FAA is non-jurisdictional: The statute does

not itself supply a basis for federal jurisdiction over FAA petitions. See Vaden,

129 S. Ct. at 1271. The Supreme Court described the non-jurisdictional cast of the

statute in Vaden this way: "'As for jurisdiction over controversies touching

arbitration,' however, the [FAA] is 'something of an anomaly' in the realm of

federal legislation: It 'bestow[s] no federal jurisdiction but rather requir[es] [for

access to a federal forum] an independent jurisdictional basis' over the parties'

dispute." Id. (quoting Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576,

581-82 (2008)) (first alteration added, subsequent alterations in original). Thus,

although the FAA "enlarg[es] the range of remedies available in the federal

courts," id. at 1283 (Roberts, C.J., concurring in part and dissenting in part)

(quotation omitted), it does not supply an independent basis for federal jurisdiction.

Therefore, the parties must identify an independent basis for federal jurisdiction

over a petition to compel arbitration brought pursuant to the FAA.

In our first panel opinion in this case, we held that in order to determine

whether there is federal question jurisdiction over a petition to compel arbitration

under § 4 of the FAA, we must "look through" the arbitration petition to the

underlying controversy and ask whether any of the underlying disputes would have

13

arisen under federal law. Strong I, 485 F.3d at 607. We then analogized the question to that of federal jurisdiction over a declaratory judgment action, which holds that "a federal district court has subject-matter jurisdiction over a declaratory judgment action if . . . [the] plaintiff's well-pleaded complaint alleges facts demonstrating the defendant could file a [non-frivolous] coercive action arising under federal law." Id. at 610 (quoting Household Bank v. JFS Group, 320 F.3d 1249, 1259 (11th Cir. 2003)) (alterations added). We concluded that, although Strong's state-court complaint expressly disavowed any federal claims, Strong's potential, non-asserted federal claims created federal question jurisdiction over the FAA petition. Id. at 611.

Although Vaden arose in an unusual procedural posture,[9] it raised substantially the same jurisdictional question we faced in Strong I. The case began "as a garden-variety, state-law-based contract action," when a Discover Bank affiliate ("Discover") sued one of its credit card holders, Vaden, in state court to

---

[9] The Court acknowledged that the posture of Vaden was "unusual," Vaden, 129 S. Ct. at 1274 n.13, noting that usually when litigation precedes the filing of a § 4 petition, it is the defendant of the lawsuit that seeks to compel arbitration and thereby avoid litigation. By contrast, in Vaden, Discover Bank was "the party that initiated litigation of the underlying dispute [and was] also the party seeking to compel arbitration." Id. Discover Bank's initial decision to litigate its dispute with Vaden without invoking the arbitration agreement may have influenced the Court's receptivity to Discover Bank's belated attempt to enlist federal court assistance in enforcing the arbitration agreement. See id. at 1277 (stating that "it is hardly fortuitous that the controversy in this case took the shape it did," as Discover Bank itself, "[s]eeking to collect a debt, . . . filed an entirely state-law-grounded complaint in state court" (internal quotation marks, alteration, and citation omitted)).

14

recover past-due charges. Vaden, 129 S. Ct. at 1268. In the state-court action, Vaden raised state-law affirmative defenses and counterclaims, asserting that Discover's finance charges, interest, and late fees violated state usury and credit laws. Id. In response, Discover commenced a separate § 4 petition in federal district court to compel arbitration of Vaden's counterclaims -- marking the first time that either party had invoked the arbitration clause in their credit card agreement. Id. at 1268-69.

After the district court ordered arbitration, the Fourth Circuit affirmed the district court's exercise of federal question jurisdiction over Discover's § 4 petition. Id. at 1270. Like this Court in Strong I, the Fourth Circuit majority adopted the "look-through" approach to determining jurisdiction over FAA § 4 petitions -- that is, that the federal court must "look through" the § 4 petition and assess federal question jurisdiction on the basis of the substantive controversy between the parties. Id. at 1269. The Fourth Circuit majority then held that Section 27(a) of the FDIA completely preempted Vaden's counterclaims, and concluded that these now-federalized counterclaims supplied a sufficient predicate for federal question jurisdiction. Id. at 1270.

On certiorari review, the Supreme Court unanimously affirmed the Fourth Circuit's "look through" approach for determining federal jurisdiction over FAA §

4 arbitration petitions, holding that "[a] federal court may 'look through' a § 4 petition and order arbitration if, 'save for [the arbitration] agreement,' the court would have jurisdiction over 'the [substantive] controversy between the parties.'" Vaden, 129 S. Ct. at 1268 (quoting 9 U.S.C. § 4) (alterations in Vaden). All members of the Court concurred in adopting this "look through" approach. See id. (majority); id. at 1279 (Roberts, C.J., concurring in part and dissenting in part).

However, the Vaden majority of five Justices reversed the Fourth Circuit's application of the "look through" rule. The majority concluded that when the parties' controversy has already been "embodied" in pending litigation, id. at 1276 n.16, as it had been in Vaden, federal jurisdiction over the subsequent FAA petition must be assessed from the face of the preexisting complaint. Id. at 1277-78. In other words, when "actual litigation has [already] defined the parties' controversy," the well-pleaded complaint rule must be applied only to the "controversy as framed by the parties"; in such cases, "[w]hether one might imagine a federal-question suit involving the parties' disagreement . . . is beside the point." Id. at 1276-77 (emphasis added). As applied to the litigation in Vaden, the Court held that the "dimensions of the controversy between the parties" were defined by Discover's original state-court complaint against Vaden. Id. at 1268 (internal quotation marks omitted). The Court explained that, because the "triggering plea" in Vaden was

16

Discover's state-law suit for past-due credit card charges, which itself contained no federal element, the federal court did not have federal question jurisdiction over Discover's subsequent § 4 petition to compel arbitration of Vaden's counterclaims, as the counterclaims were but a "slice" of the parties' full controversy. Id. The majority did not, however, answer the question of how to define the parties' controversy for purposes of determining jurisdiction when no litigation between the parties precedes the filing of the FAA petition.

Four justices who dissented in part (the Vaden "dissent") agreed that determining federal question jurisdiction requires a federal court to "look through" the FAA petition, but disagreed with the majority about what precisely a federal court should train its attention on, once it has looked through the petition. See id. at 1279 (Roberts, C.J., concurring in part and dissenting in part) ("I agree with the Court that a federal court asked to compel arbitration pursuant to § 4 of the Federal Arbitration Act should 'look through' the dispute over arbitrability in determining whether it has jurisdiction to grant the requested relief. But look through to what?"). They criticized the majority for its "mistaken focus on . . . existing litigation," id. at 1281, noting that the majority's rule turns entirely on the mere "fortuity that a complaint happens to have been filed," id. at 1279. Instead, the dissent would have held that the district court should focus on the concrete dispute

17

to be arbitrated and determine for itself whether a hypothetical suit -- whether pending or not -- arising out of that controversy would arise under federal law. Id. at 1282.

Upon careful review, we conclude that, as applied to Community State Bank, the essential holding of Strong I survives Vaden. The Bank was not a party to Strong's state-court lawsuit. Indeed, Strong expressly disavowed any claims against the Bank. Therefore, no preexisting litigation has yet defined the contours of the controversy between Strong and the Bank. The Bank's FAA petition is, in other words, what we will call "freestanding" -- that is, it does not arise out of pending litigation between the parties. As we've noted, the Vaden majority did not answer the question of how a federal court should assess the nature of the parties' controversy when faced with a freestanding FAA petition. Nonetheless, we believe the approach we adopt most faithfully adheres to the Court's reasoning in Vaden, in spite of this case's admittedly different posture.

At the outset, it is clear that Vaden did not foreclose the possibility of freestanding FAA petitions. The Court stated unambiguously:

> The parties' underlying dispute may or may not be the subject of pending litigation. This explains § 4's use of the conditional "would" and the indefinite "a suit." A party often files a § 4 petition to compel arbitration precisely because it does not want to bring suit and litigate in court.

18

Id. at 1274 n.13 (quoting 9 U.S.C. § 4) (emphasis in original); see also id. at 1276

n.16 ("Section 4, we recognize, enables a party to seek an order compelling

arbitration even when the parties' controversy is not the subject of pending

litigation."). Indeed, the Vaden Court expressly endorsed the continuing vitality of

freestanding § 4 petitions in explaining its "look through" approach, saying "the

'look through' approach permits a § 4 petitioner to ask a federal court to compel

arbitration without first taking the formal step of initiating or removing a federal-

question suit." Id. at 1275 (emphasis added).[10] Clearly, then, Vaden should not be

interpreted to mean that federal district courts lack jurisdiction over freestanding

FAA petitions.

However, in the case of a freestanding § 4 petition, by definition, there is no

preexisting litigation defining the parties' controversy to structure the court's

inquiry. The Vaden majority's jurisdictional focus on the "actual litigation [that]

has defined the parties' controversy," id. at 1277, does not answer the question we

---

[10] The proposed alternative to the "look-through" rule would have located a federal question only, if at all, in the parties' discrete dispute over the arbitrability of the asserted claims. See Vaden, 129 S. Ct. at 1274. Because such disputes are primarily contractual in nature and would rarely, if ever, raise federal questions, the Court noted that such a rule would prevent a party from enlisting the help of a federal court in compelling arbitration under the heading of federal question jurisdiction unless the party first filed or removed a federal question suit to federal court, and only then sought to compel arbitration. Id. at 1275. The Court criticized this result as "creat[ing] a totally artificial distinction based on whether a dispute is subject to pending federal litigation." Id. (internal quotation omitted). By contrast, the Court's "look-through" rule would "accommodate a § 4 petitioner who could file a federal-question suit . . . , but who has not done so." Id.

19

face of how to discern jurisdiction when no such "actual litigation" exists. Indeed, the dissent criticized the majority's "mistaken focus on . . . existing litigation" for this very reason: It provides no instruction to a court faced with a freestanding § 4 petition, where no complaint has been filed "to 'look through' to." Id. at 1281 (Roberts, C.J., concurring in part and dissenting in part) ("In many if not most cases under § 4, no complaint will have been filed. What to 'look through' to then?" (citation omitted)). The Vaden Court did not answer the question of what a district court must look through to when the parties' controversy has not yet been "embodied," id. at 1276 n.16 (majority), in litigation -- because that question was not before it.

Nonetheless, it remains clear that we must still "look through" the petition to something. The Court was very clear that jurisdiction should be predicated on the substantive dispute between the parties, not the arbitrability issue actually to be decided by the district court. See id. at 1273 ("The text of § 4 drives our conclusion that a federal court should determine its jurisdiction by 'looking through' a § 4 petition to the parties' underlying substantive controversy." (emphasis added)); id. at 1274 (rejecting the alternative construction in which "[t]he relevant 'controversy between the parties' . . . is simply and only the parties' discrete dispute over the arbitrability of their claims"). The Vaden Court thus

gives us one primary instruction for how to approach freestanding FAA petitions. "Whether or not the controversy between the parties is embodied in an existing suit, the relevant question remains the same: Would a federal court have jurisdiction over an action arising out of that full-bodied controversy?" Id. at 1276 n.16. In other words, the proper jurisdictional inquiry is whether either party to the § 4 petition "could file a federal-question suit" based on the parties' underlying dispute. Id. at 1275 (emphasis in original).

We, therefore, conclude that where the parties' controversy has not yet been embodied in preexisting litigation, "[a] district court entertaining a § 4 petition" must decide for itself "what 'a suit' arising out of the allegedly arbitrable controversy would look like." Id. at 1282 (Roberts, C.J., concurring in part and dissenting in part) (quoting 9 U.S.C. § 4). That is, the court must examine the dimensions of the "full-bodied controversy," id. at 1276 n.16 (majority), between the parties, and determine whether any hypothetical claims arising out of that controversy would support federal jurisdiction. If so, then the district court may entertain the petition and, if warranted, compel arbitration of the entire controversy. 9 U.S.C. § 4; see Vaden, 129 S. Ct. at 1275 ("[Section 4 of the FAA allows a party access to federal court if] the entire, actual 'controversy between the parties,' as they have framed it, could be litigated in federal court." (quoting 9

21

U.S.C. § 4)).

The statutory language supports such an approach, by expressly directing a court to imagine whether it hypothetically "would have jurisdiction" over "a suit arising out of the controversy between the parties." 9 U.S.C. § 4 (emphases added). The subjunctive mood overtly invites the consideration of hypothetical suits, and the indefinite article "a" suggests the court may consider any possible suit that the factual controversy could precipitate. While the Vaden Court rejected such hypothesizing where "actual litigation" is available to focus the court's inquiry, "[t]here is no helping" it when no such preexisting litigation exists. Vaden, 129 S. Ct. at 1282 (Roberts, C.J., concurring in part and dissenting in part); see id. at 1277 (majority) ("[Section] 4 does not invite federal courts to dream up counterfactuals when actual litigation has defined the parties' controversy." (emphasis added)). Nonetheless, we heed the Vaden majority's instruction not to "slice," id. at 1268, 1277, up the controversy and predicate jurisdiction on "lurk[ing]" federal questions that could only arise by way of an actual or anticipated defense, id. at 1278; rather, we look only to potential claims between the parties that could be stated on the face of a well-pleaded complaint.

B.

Although the Vaden majority had no occasion to reach the issue, Chief

22

Justice Roberts, whose opinion commanded four votes, provided some clues as to how a federal court should confront a freestanding FAA petition. As a start, a federal court should focus on "the specific controversy -- the concrete dispute that one party has 'fail[ed], neglect[ed], or refus[ed]' to arbitrate -- and determine whether that controversy would give rise to a suit under federal law." Id. at 1282 (Roberts, C.J., concurring in part and dissenting in part) (quoting 9 U.S.C. § 4). After all, FAA § 4 is only triggered when one party has expressed a "refusal" to arbitrate, and the other party has been thereby "aggrieved." See 9 U.S.C. § 4. This refusal will undoubtedly be documented in some way (for example, by a letter). Examining these pre-litigation or extra-legal communications between the parties can provide insight into the factual nature of the dispute. In addition, the FAA petitioner's description of the underlying dispute in the § 4 petition itself can provide some (although not conclusive) evidence of the contours of the dispute.[11] Thus, although the court's task necessarily requires some hypothesizing, the inquiry is not thereby utterly "free-form" or readily manipulable by the parties.

---

[11] In this regard, we part with the Vaden dissent, which apparently would accept the § 4 petitioner's statement of the controversy as dispositive. See Vaden, 129 S. Ct. at 1282 (Roberts, C.J., concurring in part and dissenting in part) (advocating that the court "[l]ook to the controversy the § 4 petitioner seeks to arbitrate [] as set forth in the § 4 petition" (emphasis added)). Instead, we heed the Vaden majority's command to examine the "whole controversy between the parties -- not just a piece broken off from that controversy," and to ensure that "[a]rtful dodges by a § 4 petitioner" not blinker the court from assessing "the full flavor of the parties' entire dispute." Id. at 1276 (majority).

23

Vaden, 129 S. Ct. at 1282 (Roberts, C.J., concurring in part and dissenting in part). As Chief Justice Roberts explained, "the exercise is closely analogous to the jurisdictional analysis in a typical declaratory judgment action," which requires a court to imagine for itself which coercive claims the parties' dispute could hypothetically support, in order to determine whether a hypothetical coercive lawsuit brought by the declaratory judgment defendant would present a federal question on the face of its well-pleaded complaint. Id. (citing Franchise Tax Bd., 463 U.S. at 19).

In short, the appropriate way to determine jurisdiction over the instant FAA petition as to Community State Bank remains, in its essence, the same one this Court adopted in Strong I. We must discern the nature of the parties' "whole controversy," id. at 1276 (majority), on the basis of their various representations to the court, and then determine whether "a suit" arising out of the underlying dispute "would" support federal jurisdiction, 9 U.S.C. § 4. See Strong I, 485 F.3d at 606 ("We therefore look to petitioners' own statement of the dispute or disputes they wish to arbitrate, and in this, they are not limited to seeking compelled arbitration of claims that have been brought against them in court."); cf. id. at 607 ("[W]e must 'look through' the petition to compel arbitration and . . . ask: If petitioners had brought this dispute in federal district court . . . , would it have arisen under

24

federal law?").

To understand the "full flavor" of the parties' underlying dispute in this case, see Vaden, 129 S. Ct. at 1276, we examine the Bank's allegations in its FAA petition, as well as the exhibits attached thereto, which in this case include Strong's state-court complaint and the correspondence between the parties regarding arbitration. The Bank's FAA petition characterizes the underlying dispute as being "whether a loan made to Respondent is governed by Section 27 of the Federal Deposit Insurance Act, . . . as opposed to state law." The petition states that "[t]he legal theory of the State Action is that the Loans are made not by the Bank but rather by a Cash America Petitioner, as the de facto lender." The Petitioners seek an order directing that "the disputes raised in the State Complaint and the additional disputes described herein be determined by binding individual arbitration in accordance with the Arbitration Provision." The Petitioners note that "[i]n the arbitration demanded by this Petition, Petitioners will seek a declaration that the interest on Respondent's Loan is governed by Section 27 and that the Loan is lawful."

The exhibits to the petition provide additional insight into the "full flavor" of the underlying dispute between the parties. See Vaden, 129 S. Ct. at 1276. In

25

Strong's state-court complaint filed against the Cash America defendants,[12] Strong described the underlying dispute as one of "subterfuge," in which the out-of-state bank claimed immunity from usury laws as the purported maker of the loan, "[y]et, in reality, the out-of-state bank ha[d] little involvement other than lending its name to the transaction." Strong, therefore, claimed the Cash America defendants were "the de facto lenders," despite what the loan documents showed. Strong repeatedly declared that it was the Cash America defendants who "made" or "extended" the loans to him and the class members, and "charged" him interest.[13] He alleged that in so doing, the Cash America defendants violated, inter alia, Georgia usury statutes, the Georgia Industrial Loan Act, and Georgia RICO.

---

[12] Because the Bank was not a party to Strong's state-court litigation, we do not "look through" the petition to Strong's state-court complaint exclusively, as Vaden would require for the Cash America defendants. However, because the Bank characterizes its own controversy by explicitly referencing Strong's complaint in its FAA petition, and, notably, attaches the complaint as an exhibit to its petition as demonstrative evidence of the parties' underlying dispute, it is appropriate for us to consider it insofar as it helps us discern the nature of the dispute between Strong and the Bank.

[13] Thus, in paragraph 58, Strong said, "Defendants [Cash America] made loans to Plaintiff and other[s] similarly situated . . . without being licensed . . . as required by [Georgia law]"; in paragraph 61, "[a]ll loans by Defendants were made in violation of the Georgia Industrial Loan Act"; in paragraph 62, "[a]ll loans made by Defendants are null and void"; and in paragraph 69, "Defendants violated the duty owed to Plaintiff and the Class when they made loans of $3,000 or less [at usurious rates]." (Compl. ¶¶ 58, 61, 62, 69 (emphases added)). In paragraph 89, Strong alleged that "Defendants conspired to illegally extend loans to Georgians charging annual interest rates in excess of that allowed by law." (Id. ¶ 89 (emphases added)). In paragraph 47, Strong described one of the common questions of fact as "[w]hether Defendants charged more than 10% per annum simple interest on loans of $3,000 or less in violation of [Georgia law]"; and in paragraph 82, Strong alleged that "Defendants charged Plaintiff and the Class an amount in excess of 10% of the face amount of the check." (Id. ¶¶ 47, 82 (emphases added)).

Finally, the correspondence evidencing Strong's "refusal" to submit the dispute to arbitration, see 9 U.S.C. § 4, which was also attached to the Bank's FAA petition, further illuminates the dispute between the parties. In a letter to Strong's counsel, counsel for the Bank characterized the dispute this way: "In the [state-court] Lawsuit[], you allege that your loan[] dated . . . February 6, 2004 (the "Loan[]"), made in the name of Community State Bank (the "Bank"), [was] actually made by other parties and that, accordingly, the Loan[] violate[d] Georgia usury laws and [is] otherwise unlawful. It is the position of the Lawsuit Defendants and the Bank . . . that the Loan[] [was] made by the Bank and that the legality of the interest charges on the Loan[] is accordingly governed by Section 27(a) of the Federal Deposit Insurance Act . . . ." Strong's counsel responded, "Plaintiff[] believe[s] that the payday loan contract[] entered into between Plaintiff[] and your client [Cash America] [is] unconscionable and unenforceable. Accordingly, we plan to move forward with our lawsuit . . . ."

C.

Having probed the factual basis of the underlying controversy between the parties, we now explore the potential lawsuits that could arise between the parties from this controversy. In so hypothesizing, we can only consider well-pled, non-

27

frivolous potential suits.[14]  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89

(1998) (stating that federal subject matter jurisdiction may not be premised on a

"wholly insubstantial and frivolous" claim (quoting Bell v. Hood, 327 U.S. 678,

682-83 (1946))); Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) ("[T]he

well-pleaded complaint rule . . . provides that federal jurisdiction exists only when

a federal question is presented on the face of the plaintiff's properly pleaded

complaint." (emphasis added) (internal quotation marks omitted)).  Anticipated

federal defenses are irrelevant.  See Vaden, 129 S. Ct. at 1272 ("Federal

jurisdiction cannot be predicated on an actual or anticipated defense." (citing

Mottley, 211 U.S. at 152)).  Moreover, in conducting this inquiry, we may only

consider potential claims between Strong and the Bank; jurisdiction over the

Bank's petition may not be founded on potential claims that exist only between

Strong and Cash America.

We can discern at least one potential basis for federal jurisdiction over the

Bank's FAA petition.  The dispute between Strong and the Bank could support a

potential Federal Racketeer Influenced and Corrupt Organizations ("Federal

---

[14] We consider only potential coercive actions here.  We have no occasion to consider hypothetical declaratory judgment actions, because the jurisdictional analysis regarding a potential declaratory judgment suit by the Bank is simply the mirror image of the jurisdictional analysis regarding potential coercive suits by Strong.  See Household Bank, 320 F.3d at 1251 (holding that jurisdiction over a declaratory judgment action depends on whether the declaratory judgment defendant could file a non-frivolous coercive claim against the declaratory judgment plaintiff arising under federal law).

28

RICO") claim against the Bank, that would be both well pled and non-frivolous, and which would state a federal issue on its face. Federal RICO prohibits conducting the affairs of an enterprise affecting interstate commerce through the collection of an "unlawful debt," that is, charging a usurious rate that is more than twice the enforceable rate under either state or federal law, or conspiring to do the same. 18 U.S.C. §§ 1961-1962.[15]

If the Bank were the true lender of Strong's loan, it could not be liable for violating Federal RICO through the collection of an "unlawful debt." As an FDIC-insured, state-chartered bank, the Bank is not subject to Georgia's usury laws; instead, it is authorized under Section 27(a) of the FDIA to export its home-state usury laws. See 12 U.S.C. 1831d(a) (allowing state-chartered, FDIC-insured banks to charge "interest . . . at the rate allowed by the laws of the State . . . where the bank is located," "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section"). The Bank is chartered in South

---

[15] Federal RICO prohibits, inter alia, investing in, acquiring an interest in, or conducting the affairs of an enterprise engaged in or affecting interstate commerce, through the "collection of an unlawful debt." 18 U.S.C. § 1962(a)-(c). Section 1962(d) prohibits conspiracy to commit the same. Id. § 1962(d). Section 1961(6) defines an "unlawful debt" as "a debt (A) . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." Id. § 1961(6). Section 1961(4) defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4).

29

Dakota, which places no limitation on interest rates. See S.D. Codified Laws §

54-3-1.1 (imposing "no maximum interest rate . . . or usury rate restriction" under

state law). Therefore, if the Bank were the true lender of the loan under federal

law, there would be no RICO violation, because there would be no predicate

offense of collecting an "unlawful debt."

However, Strong could potentially assert (and has in fact alleged facts

supporting) a non-frivolous Federal RICO claim against the Bank under a theory of

conspiracy. See 18 U.S.C. § 1962(d). To do so, Strong would have to plead facts

demonstrating that the Bank was not the actual lender (otherwise, the predicate

usury violation would be lacking), yet the Bank conspired with Cash America to

facilitate Cash America's making of usurious loans. Because this cause of action is

a creature of federal law, such a claim would clearly state a federal question on the

face of the well-pleaded complaint.

Given the nature of the parties' dispute, such a Federal RICO conspiracy

claim would be well pled and non-frivolous, even if not in the end meritorious.

Members of this Court have already recognized that Section 27(a)'s protections

extend to a state bank only insofar as it is the true lender under federal law. As

Judge Carnes has observed:

> [Section 27(a) preemption] does not mean that any transaction where
> an out-of-state bank associates with a non-bank agent in Georgia is

30

protected, even if the relationship is clearly a sham. If, under federal law, a transaction is not actually a loan from an out-of-state bank within the meaning of § 27(a), then the bank does not have the right to export its charter state's interest rate under § 27(a).

BankWest, Inc. v. Baker, 411 F.3d 1289, 1319 (11th Cir. 2005) (Carnes, J., dissenting), majority opinion vacated for mootness, 446 F.3d 1358 (11th Cir. 2006). The BankWest majority likewise agreed that Section 27(a)'s protection of out-of-state banks is not absolute, and even went further to hold in the context of the state payday lending statute that although state banks were exempt from direct violations of the statute, they could be liable under the "aid[ing] or abet[ing]" provision of the statute, consistently with Section 27(a) of the FDIA. See BankWest, 411 F.3d at 1308 ("[W]e conclude that . . . Section 27(a) does not preempt state legislation imposing penalties on . . . out-of-state banks who aid and abet [direct] violations [of the payday lending statute]."), vacated for mootness, 446 F.3d 1358. We agree with the view that Section 27(a) does not provide immunity to a state bank for usury-related offenses if it is not the true lender of the loan under federal law.

Bringing this conspiracy claim would require careful pleading by Strong to navigate this narrow legal path. He would have to allege, on the one hand, that the Bank was not the true lender of the loan, and yet, on the other hand, that the Bank was sufficiently complicit in the illegal act so that it could be deemed a conspirator

31

(e.g., by knowingly and willfully lending its name to the sham operation).

Nonetheless, Strong has alleged facts that render this claim plausible and non-frivolous. In Strong's state-court complaint, Strong referred to the Bank's relationship with Cash America as a "subterfuge," and alleged that the Bank "has little involvement other than lending its name to the transaction." He called Cash America "the de facto lenders," and repeatedly alleged that it was the Cash America defendants that "made" or "extended" the loan to him. If Strong could substantiate these claims in his lawsuit, he could potentially prevail on a Federal RICO claim against the Bank. In short, the claim would not be frivolous.

Because we find that Strong's potential Federal RICO claim against the Bank provides a basis for jurisdiction over the Bank's FAA petition, we decline to reach the question of whether Section 27(a) of the FDIA completely preempts state-law usury claims against state-chartered banks. Cf. Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 9-10 (2003) (holding that the National Bank Act, 12 U.S.C. §§ 85, 86, completely preempts state-law usury claims against national banks).[16]

---

[16] Complete preemption is a rare doctrine that entirely transforms a state-law claim into a federal claim, regardless of how the plaintiff framed the legal issue in his complaint. Blab T.V. of Mobile, Inc. v. Comcast Cable Commc'ns, Inc., 182 F.3d 851, 854-55 (11th Cir. 1999); see also U.S. Const. art. VI, cl. 2. Under complete preemption, "the pre-emptive force of a [federal] statute is so extraordinary," Caterpillar, 482 U.S. at 393 (internal quotation marks omitted), that the "federal statute wholly displaces the state-law cause of action." Beneficial, 539 U.S. at 8. Thus, "any complaint raising claims in that area is necessarily federal in character." Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1281 (11th Cir. 2005). Complete preemption creates federal subject-matter jurisdiction over completely preempted state-law claims, allowing for

The Supreme Court, too, has declined to answer this question. See Vaden, 129 S. Ct. at 1269 n.4.

In sum, in looking through the Bank's FAA petition, we see a potential coercive claim between Strong and the Bank that would be both well pled and non-frivolous, and which would state a federal issue on its face -- namely, a Federal RICO conspiracy claim. Under the look-through rule, this hypothetical coercive claim in turn supplies a basis for federal jurisdiction over the Bank's FAA petition. Therefore, with respect to the Bank, we reverse the district court's dismissal of the FAA petition and again hold to the contrary, as we did in Strong I, 485 F.3d at 600, that the district court has subject matter jurisdiction over the Bank's petition to compel arbitration under the FAA. Accordingly, we remand to the district court with instructions to determine in the first instance whether to compel arbitration pursuant to the FAA, 9 U.S.C. § 4.

III.

removal to federal court.

Complete preemption is distinct from "ordinary" or "defensive" preemption. Ordinary preemption simply allows a defendant to defeat a plaintiff's state-law claim on the merits by asserting the supremacy of federal law as an affirmative defense. See Blab T.V., 182 F.3d at 855. By contrast to complete preemption, "defensive preemption does not furnish federal subject-matter jurisdiction under 28 U.S.C. § 1331." Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1212 (11th Cir. 1999); see also Caterpillar, 482 U.S. at 393 ("[I]t is now settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.").

33

We now turn to the Cash America petitioners. Because the Cash America petitioners were named as defendants in Strong's state-court lawsuit, we would be constrained by the holding in Vaden to "look through" exclusively to Strong's state-court complaint to determine whether there was federal jurisdiction over Cash America's FAA petition. However, we need not pursue this inquiry because we conclude that Cash America's petition to compel arbitration must be dismissed based on the preclusive effect of a prior state-court judgment.[17]

---

[17] Strong twice raised the state-court judgment as an alternative basis on which to affirm the district court's order dismissing the FAA petition in this case. (See Suggestion of Mootness by Appellee ("Strong's Mootness Br."), filed Oct. 17, 2005; Appellee's Supplemental Brief Regarding the Impact of Vaden v. Discover Bank ("Strong's Vaden Br."), filed June 22, 2009, at 12.) Strong said that "[Cash America's] ability to compel arbitration in a state or federal forum against [Strong] has been mooted by the State Court's order striking this defense." (Strong's Mootness Br. at 3.) Although Strong failed to use the words "res judicata" or "collateral estoppel," we nonetheless find that Strong has sufficiently raised the issue of preclusion such that this Court may address it. We note in passing that the Supreme Court of Georgia has similarly found that a party sufficiently raised a preclusion defense even without specifically articulating it as either res judicata or collateral estoppel. See Boozer v. Higdon, 313 S.E.2d 100, 102 & n.1 (Ga. 1984) (holding that a "probate court order was sufficient evidence to support Boozer's defense, when construed as a plea of collateral estoppel," even though "Boozer's defensive pleading did not specifically enumerate either res judicata or collateral estoppel as its grounds, but merely stated that 'the matter [has been] formally adjudicated in the Probate Court of Cobb County . . . '"). And indeed, even if the parties had not raised the issue, this Court may consider the preclusive effect of a prior judgment sua sponte. See Am. Furniture Co. v. Int'l Accommodations Supply, 721 F.2d 478, 482 (5th Cir. Unit A Mar. 1981) ("We are cognizant that res judicata, as such, has not been specially pled. In the posture of this case, however, where all of the relevant facts are contained in the record before us and all are uncontroverted, we may not ignore their legal effect, nor may we decline to consider the application of controlling rules of law to dispositive facts, simply because neither party has seen fit to invite our attention to the issue by technically correct and exact pleadings. We do so sua sponte." (citation omitted)); cf. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all former Fifth Circuit decisions handed down before the close of business on September 30, 1981); cf. also Arizona v. California, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action sua sponte, even though the defense has not been raised. This result is fully

34

A.

While the instant FAA petition was pending in federal court, the Cash

America defendants moved to stay the state-court proceedings and compel

arbitration of Strong's claims (after an unsuccessful removal to federal court and

subsequent remand for lack of jurisdiction). On April 18, 2006, the state trial court

ordered the parties to conduct limited discovery on the issue of the enforceability

of the arbitration agreement -- in particular, the factual issues relating to the

potential defenses of "fraud in the factum" and procedural unconscionability. See

Ga. Cash Am., Inc. v. Strong, 649 S.E.2d 548, 551, 553 (Ga. Ct. App. 2007). The

Cash America defendants did not attempt to appeal this order. Id. at 551-52.

When the defendants failed to produce any of Strong's requested discovery, Strong

moved to compel. Id. at 552. On July 17, 2006, after a hearing on Strong's

consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste." (quoting United States v. Sioux Nation, 448 U.S. 371, 432 (1980) (Rehnquist, J., dissenting)).

Moreover, "[Cash America] can claim no surprise or prejudice" by our addressing collateral estoppel here. Am. Furniture Co., 721 F.2d at 482. Cash America specifically treated Strong's mootness argument as one of claim or issue preclusion. (See Petitioners' Response to the Suggestion of Mootness by Appellee James E. Strong ("Petitioners' Mootness Resp."), filed Nov. 3, 2006, at 3-4.) And Cash America was given "a chance to argue . . . why the imposition of an estoppel would be inappropriate." Blonder-Tongue Labs., Inc. v. Univ. Found., 402 U.S. 313, 350 (1971). In particular, Cash America argued estoppel would be inappropriate because the state-court order regarding sanctions was neither "on the merits" nor final. (Petitioners' Mootness Resp. at 3.) We address these arguments below and conclude neither is persuasive. In the end, the dispositive facts here are "uncontroverted," and "we may not ignore their legal effect." Am. Furniture Co., 721 F.2d at 482.

35

motion, the trial court found that the defendants had flouted its discovery order and "deliberately chose to not even review the documents or produce a privilege log" to substantiate their blanket objections. Id. at 552 (quoting trial court's July 17, 2006 order). Nor had the defendants requested a protective order for those documents they asserted were protected from disclosure. Id. The state court again ordered the defendants to comply with the plaintiff's discovery requests. Id. at 553.

On October 11, 2006, after yet another hearing, the state court ruled that the defendants had "deliberately and willfully failed and refused to produce the documents which were the subject of the April 18 and July 17 orders." Id. at 556 (quoting trial court's October 11, 2006 order). The trial court held the defendants in contempt, and, as a sanction, struck the defendants' arbitration defenses, pursuant to Georgia Code Section 9-11-37(b)(2).[18] Id. at 553. The Court of

---

[18] Section 9-11-37(b)(2) of the Official Code of Georgia Annotated provides:

If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just and, among others, the following:
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the

Appeals of Georgia affirmed the judgment on July 6, 2007.  Id. at 556.[19]  The

Supreme Court of Georgia denied certiorari on September 24, 2007.  Id. at 548.

When we rendered our decision in Strong I, the state-court sanction had not

yet been upheld on appeal and thus did not yet constitute a final judgment for

purposes of claim or issue preclusion. See Strong I, 485 F.3d at 613 n.21.

However, now that the sanction represents a final judgment from a court of

competent jurisdiction, the doctrine of collateral estoppel prevents Cash America

from relitigating those issues here.

B.

---

disobedient party;
(D) In lieu of any of the foregoing orders, or in addition thereto, an order
treating as a contempt of court the failure to obey any orders . . . .

[19] The Court of Appeals of Georgia permits interlocutory appeals when:

(1) The issue to be decided appears to be dispositive of the case; or
(2) The order appears erroneous and will probably cause a substantial error at trial
or will adversely affect the rights of the appealing party until entry of final judgment
in which case the appeal will be expedited; or
(3) The establishment of precedent is desirable.

Ga. Ct. App. R. 30.  To appeal, the losing party must first seek a certificate of immediate review
from the trial court: "[I]n any appeal under this chapter where the order, decision, or judgment is
not final, it shall be necessary that the trial judge certify within ten days of entry thereof that the
order, decision, or judgment is of such importance to the case that an immediate review should
be had."  Ga. Code Ann. § 5-7-2; see also id.. § 5-6-34(b) ("Where the trial judge in rendering an
order, decision, or judgment, not otherwise subject to direct appeal . . . certifies within ten days
of entry thereof that the order, decision, or judgment is of such importance to the case that
immediate review should be had, the Supreme Court or the Court of Appeals may thereupon, in
their respective discretions, permit an appeal to be taken from the order, decision, or judgment if
application is made thereto within ten days after such certificate is granted.").

The general principle of res judicata prevents the relitigation of issues and claims already decided by a competent court. "Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel." Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591, 598 (1948). Res judicata comes in two forms: claim preclusion (traditional "res judicata") and issue preclusion (also known as "collateral estoppel"). See id. at 597-98.

In considering whether to give preclusive effect to state-court judgments under res judicata or collateral estoppel, the federal court must apply the rendering state's law of preclusion. See Kizzire v. Baptist Health Sys., Inc., 441 F.3d 1306, 1308 (11th Cir. 2006) (res judicata); Agripost, Inc. v. Miami-Dade Cnty., ex rel. Manager, 195 F.3d 1225, 1229 n.7 (11th Cir.1999) (collateral estoppel); see also 28 U.S.C. § 1738. Thus, in this case, we are obliged to apply Georgia preclusion law.

While claim preclusion bars "repetitious suits involving the same cause of action," Sunnen, 333 U.S. at 597 (emphasis added); accord Cromwell v. Cnty. of Sac, 94 U.S. 351, 352 (1876), issue preclusion precludes the re-adjudication of the same issue, where the issue was actually litigated and decided in the previous adjudication, even if it arises in the context of a different cause of action, Karan, Inc. v. Auto-Owners Ins. Co., 629 S.E.2d 260, 262 (Ga. 2006); Waldroup v.

38

Greene Cnty. Hosp. Auth., 463 S.E.2d 5, 7 (Ga. 1995); Dep't of Human Res. v. Fleeman, 439 S.E.2d 474, 475 (Ga. 1994). Because the instant FAA petition and the state-court litigation as a whole do not share identical causes of action, which is required for the application of claim preclusion, Morrison v. Morrison, 663 S.E.2d 714, 718 (Ga. 2008), we treat the instant preclusion question as one of collateral estoppel.

Although Georgia law has not settled on a canonical list of elements to establish collateral estoppel, Georgia case law can be distilled into the following formulation: A party seeking to assert collateral estoppel under Georgia law must demonstrate that (1) an identical issue, (2) between identical parties, (3) was actually litigated and (4) necessarily decided, (5) on the merits, (6) in a final judgment, (7) by a court of competent jurisdiction. See Body of Christ Overcoming Church of God, Inc. v. Brinson, 696 S.E.2d 667, 669 (Ga. 2010) (requiring for collateral estoppel that "issue . . . had been resolved on the merits in prior litigation," "identity of the parties or their privies between the two actions," and that "previous litigation was decided by a court of competent jurisdiction"); Karan, 629 S.E.2d at 262-63 ("[C]ollateral estoppel precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies . . . [where] those issues . . .

actually were litigated and decided in the previous action, or . . . necessarily had to be decided in order for the previous judgment to have been rendered." ) (quoting Waldroup, 463 S.E.2d at 7); In re T.M.G., 570 S.E.2d 327, 329 (Ga. 2002) (requiring for collateral estoppel "identity of the parties . . . in both actions" and that same issue "actually [was] litigated and decided in the previous action" or "necessarily had to be decided in order for the previous judgment to have been rendered") (citing Waldroup, 463 S.E.2d at 7); Kent v. Kent, 452 S.E.2d 764, 766 (Ga. 1995) ("[C]ollateral estoppel applies where an issue of fact or law is actually litigated and determined by a valid judgment, and the determination is essential to the judgment.").[20]  Thus, as a general principle, issue preclusion requires the same elements as claim preclusion,[21] except that instead of requiring an identical cause

---

[20] Although this Court recited a slightly different formulation of the requisite collateral estoppel elements in Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1359 (11th Cir. 1998) (citing I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir. 1986)) (not requiring identity of parties), the Court appeared to draw those elements from federal common law rather than Georgia law, and acknowledged in a footnote that "the parties and the district court have failed to address whether federal or state principles of collateral estoppel apply to this question." Pleming, 142 F.3d at 1359 n.6.  The court did not reach the question of which law to apply, because both Georgia and federal law required "the actual litigation of the issue in question in the prior proceeding," which was dispositive of the issue in the case. Id.  The court cited to Waldroup, 463 S.E.2d at 7, as representing the Georgia law of collateral estoppel. Waldroup supports the formulation we have laid out in the text above, requiring identity of parties.  Of course, it would make no difference in this case, because there is identity of parties.

[21] Under Georgia law, a case is barred by claim preclusion if the following elements are met: "(1) identity of the cause of action, (2) identity of the parties or their privies, . . . (3) previous adjudication on the merits by a court of competent jurisdiction"; (4) embodied in a final judgment. Karan, 629 S.E.2d at 262; see also Ga. Code Ann. § 9-12-40.

of action, it requires only an identical <u>issue</u> between the two cases, where the issue was actually litigated and decided in the previous adjudication. See <u>Waldroup</u>, 463 S.E.2d at 7 ("[U]nlike res judicata, collateral estoppel does not require identity of the claim -- so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim.").

C.

We conclude that Georgia's law of collateral estoppel bars the district court from granting the relief requested by Cash America's FAA petition in the instant case. We consider each of the necessary elements of collateral estoppel in turn.

### 1. Competent Jurisdiction

The parties do not dispute that the rendering court -- the State Court of Cobb County -- had jurisdiction over both the parties and the subject matter of the controversy.[22] The case was properly before the state court after having been remanded from the federal court for lack of federal jurisdiction.

### 2. Final Judgment

"It is the general rule that a judgment sought to be used as a basis for the

---

[22] While Georgia county state courts, as opposed to superior courts, are courts of limited jurisdiction, their jurisdiction extends to "[t]he trial of civil actions without regard to the amount in controversy, except those actions in which exclusive jurisdiction is vested in the superior courts." Ga. Code Ann. § 15-7-4(a)(2).

application of the doctrine of res judicata (or collateral estoppel) must be a final

judgment." CS-Lakeview At Gwinnett, Inc. v. Retail Dev. Partners, 602 S.E.2d

140, 142 (Ga. Ct. App. 2004) (quotation omitted);[23] Restatement (Second) of

Judgments § 13 (1982) ("Restatement of Judgments") ("The rules of res judicata

are applicable only when a final judgment is rendered."). In general, "under

Georgia law finality for preclusion purposes may . . . be measured by the same

standard as finality for appealability purposes." Lops v. Lops, 140 F.3d 927, 938

(11th Cir. 1998); accord Culwell v. Lomas & Nettleton Co., 248 S.E.2d 641, 642

(Ga. 1978) (equating appealability and expiration of appeal period with preclusive

effect). The courts of Georgia and our own binding precedent interpreting Georgia

law have clarified that when a trial judge certifies an interlocutory order for

immediate appeal, the order becomes final for purposes of both appealability and

preclusion. See Culwell, 248 S.E.2d at 642 (holding that "[i]f the trial court does

certify that the judgment is final and ripe for review under Code Ann. §

81A-154(b) [now § 9-11-54(b)[24]], the time for appeal begins to run," creating "res

---

[23] "Absent a decision by the highest state court or persuasive indication that it would decide the issue differently, federal courts follow decisions of intermediate appellate courts in applying state law." Galindo v. ARI Mut. Ins. Co., 203 F.3d 771, 775 (11th Cir. 2000).

[24] Section 9-11-54(b) provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but

judicata effect"); <u>Walker v. Robinson</u>, 207 S.E.2d 6, 7 (Ga. 1974) (holding that for order to be appealable, it must either resolve all claims or else be accompanied by trial court certificate of appeal); <u>see also</u> <u>Gresham Park Cmty. Org. v. Howell</u>, 652 F.2d 1227, 1242 n.43 (5th Cir. Unit B Aug. 1981) (explaining that "final judgments" for purposes of res judicata include "those in which the action is no longer pending" and "those made final through the appropriate certification [by the trial court] under Ga. Code § 81A-154(b) [now § 9-11-54(b)]"), <u>overruled on other grounds</u>, <u>Wood v. Orange Cnty.</u>, 715 F.2d 1543, 1546 (11th Cir. 1983).

Cash America correctly argued in its briefing to this Court that "only a final judgment has preclusive effect and a judgment that is subject to appellate review or is being appealed is not a final judgment." (Petitioners' Mootness Resp. at 4.) It is true that the preclusive effect of a judgment is suspended while the order is on appeal. <u>See</u> Ga. Code Ann. § 9-12-19. Cash America specifically informed this Court before our decision in <u>Strong I</u> that it "intend[ed] to appeal the [state court's]

---

fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Ga. Code Ann. § 9-11-54(b) (emphasis added).

43

Order." (Id.) Accordingly, in Strong I, we did not hold that the state-court sanction precluded Cash America from pursuing its FAA petition. See Strong I, 485 F.3d at 613 n.21. However, a judgment becomes final for all purposes upon the conclusion of the appeals process. Ga. Code Ann. § 9-11-60(h) ("[A]ny ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case . . . ."); cf. CS-Lakeview, 602 S.E.2d at 142. The Cash America defendants successfully sought an interlocutory appeal from the state court's order striking their arbitration defense, and the state-court judgment was affirmed by the Court of Appeals of Georgia. See Ga. Cash Am., 649 S.E.2d at 550, 556. The Supreme Court of Georgia denied certiorari. Id. at 548. The judgment is now final for all preclusive purposes.

### 3. Identical Parties

Strong named three Cash America parties -- Cash America International, Inc., Georgia Cash America, Inc., and Daniel R. Freehan, the CEO of both companies -- as defendants in his state-court complaint. The state court's sanction was imposed as to all defendants jointly in that litigation. See Ga. Cash Am., 649 S.E.2d at 551, 553. The very same Cash America defendants brought the instant FAA petition.[25] They named Strong as the Respondent in this petition. Thus, as

---

[25] There is also a new Cash America petitioner that was not specifically named as a defendant in the state-court litigation, called Cash America Financial Services, Inc. However, it

between Strong and the Cash America defendants, there is identity of parties in both the state-court case and the instant FAA petition.[26]

###### 4.    Identical Issue

The issue presented to the federal district court in the instant FAA petition is the identical issue that was already decided by the state court: whether Strong's claims that the conditions of his loan violated state law are subject to binding arbitration.  This is the threshold issue both for a federal court to grant relief to Cash America under Section 4 of the FAA, and for a state court to adjudicate the merits of Cash America's asserted arbitration defense in the state-court litigation.

Both the state and federal courts would decide the issue under identical governing law.  The substantive provisions of the FAA -- found in § 2, the Act's "centerpiece provision," Vaden, 129 S. Ct. at 1274 (quoting Mitsubishi, 473 U.S. at 625) -- are "equally binding on state and federal courts."  Id. at 1271 (citing

---

appears that Cash America Financial Services, Inc. is either the parent corporation or an affiliate of Georgia Cash America, Inc.  Indeed, Cash America Financial Services, Inc. expressly referred to itself as a defendant in Strong's state-court litigation, stating in the FAA petition that "Petitioners . . . Cash America Financial Services, Inc. ("Cash America") . . . bring this Verified Petition . . . to stay a court proceeding . . . initiated by Respondent against Cash America [Financial Services, Inc.]."  In other words, Cash America Financial Services, Inc. has itself conceded that it is an identical party in both lawsuits.

[26] The Cash America defendants are bound by the prior judgment even though they brought the instant petition together with Community State Bank, which was not a party in the state-court litigation.  See Crider v. Harris, 189 S.E. 519, 520 (Ga. 1937) (holding that prior judgment was res judicata as to plaintiffs who were parties to first action, notwithstanding that new party in second action was not bound by judgment).

<u>Southland Corp. v. Keating</u>, 465 U.S. 1, 12 (1984)).  Both state and federal courts

must compel arbitration if the substantive provisions of Section 2 are satisfied; that

is, both courts must find the arbitration agreement "valid, irrevocable, and

enforceable," unless the court finds "such grounds as exist at law or in equity for

the revocation of any contract."  9 U.S.C. § 2.[27]

In both state and federal court, Strong alleged defects in the "making of the

arbitration agreement," 9 U.S.C. § 4 -- namely fraud in the factum and procedural

unconscionability, either of which would constitute "grounds [that] exist at law or

in equity for the revocation of any contract."  9 U.S.C. § 2.[28]  Such contractual

defects would equally undermine Cash America's state-court arbitration defenses

---

[27] The full text of Section 2 provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

[28] The ability of such contractual defects to invalidate arbitration agreements is not affected by the Supreme Court's decision in <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. --, 131 S. Ct. 1740 (2011), which preserved "generally applicable contract defenses, such as fraud, duress, or unconscionability," so long as the defenses do not "apply only to arbitration or . . . derive their meaning from the fact that an agreement to arbitrate is at issue." <u>Id.</u> at 1746 (quotation omitted); <u>see also</u> <u>id.</u> at 1753 (Thomas, J., concurring) (acknowledging arbitration agreements may be invalidated by "challenges [to] the formation of the arbitration agreement, such as . . . fraud or duress").

and its claim for § 4 relief. Because the FAA petition in this case was stalled on federal jurisdiction grounds, the state court reached the issue of the arbitration agreement's enforceability first. This issue is identical to the one that the federal district court faces in adjudicating Cash America's § 4 petition.

### 5. Actually Litigated

To support collateral estoppel, the issue must have been "actually . . . litigated" in the previous litigation. Karan, 629 S.E.2d at 262-63 (quoting Waldroup, 463 S.E.2d at 7). An issue is considered "actually litigated" when the "issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." Restatement of Judgments § 27, cmt. d. Requiring that issues be "actually litigated" ensures that collateral estoppel precludes only those issues that were contested by the parties. See Cleland v. Gwinnett Cnty., 487 S.E.2d 434, 436 (Ga. Ct. App. 1997) (holding that where one party's interpretation was accepted without contest by both the other party and the court, "it was not 'actually litigated'" and thus could not support collateral estoppel in subsequent litigation).

The state-court litigants unquestionably "actually litigated" the issue of whether Strong's state-court claims were subject to binding arbitration. The Cash America defendants clearly raised the issue in the pleadings by asserting the

47

existence of the arbitration agreement in support of their "first, sixth and seventh defenses" in their Answer to Strong's complaint. See Order at 5-6, Strong v. Ga. Cash Am., Inc., No. 2004A-7104-6 (Ga. Cobb Cnty. Oct. 11, 2006). Additionally, the defendants raised the issue by way of motion, in moving to stay the proceedings and compel arbitration, pursuant to the arbitration agreement. See Ga. Cash Am., 649 S.E.2d at 551. Further, the issue was contested, in that Strong disputed the agreement's enforceability on the grounds of procedural unconscionability and fraud in the factum. Id.; see Cleland, 487 S.E.2d at 436 (issues are "actually litigated" if they are "contested" by the parties). The state court provided the defendants with an opportunity to substantiate their arbitration defenses and overcome Strong's objections to the arbitration agreement's enforceability by ordering discovery on the issue. Finally, the state court decided the issue against the defendants by striking their arbitration defenses based on a finding that the defendants "deliberately and willfully failed and refused" to follow the court's orders to take discovery on the issue. Ga. Cash Am., 649 S.E.2d at 553; see also Ga. Code Ann. § 9-11-37(b)(2). There is no question that the enforceability of the arbitration agreement was raised and contested, which is all that is required by the "actually litigated" requirement.

6.      Necessarily Decided

48

The "necessarily decided" prong of the collateral estoppel test ensures that the prior court actually ruled on the issue at hand. The issue must have been squarely addressed, or "directly decided," in the former suit before it can be held as conclusive for subsequent litigation. Tootle v. Player, 169 S.E.2d 340, 341 (Ga. 1969) (quoting Brown v. Brown, 91 S.E.2d 495, 497 (Ga. 1956)). "[I]t is of the essence of estoppel by judgment that it is certain that the precise fact was determined by the former judgment." De Sollar v. Hanscome, 158 U.S. 216, 221 (1895).

The essential role of this "necessarily decided" requirement is that it prevents judgments that rest on ambiguous grounds from having issue preclusive effect. Thus, where two or more possible grounds would theoretically support a judgment, and both were actually litigated, and the court does not clearly state on which ground its judgment rests, the judgment cannot have issue preclusive effect as to either issue, for neither is definitively the ground of the judgment. See Restatement of Judgments § 27, cmt. i ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone."); see also Callaway v. Irvin, 51 S.E. 477, 480 (Ga. 1905) ("Thus, where several defenses are pleaded, and the judgment does

not show upon which issue the decision was rendered, there is no estoppel.").[29]  By

contrast, an issue is "necessarily decided" when the prior court in fact "resolved"

it.  Lindsey v. State, 651 S.E.2d 66, 71 (Ga. 2007) (quotation omitted).

This case easily satisfies the "necessarily decided" prong.  The state court's

order was unambiguous, and addressed only one issue: whether Strong's state-

court claims were subject to binding arbitration.  It squarely resolved this issue

against the Cash America defendants.  This is not a case in which a court issued an

ambiguous dismissal order without stating its grounds or reasoning.  Only one

issue was before the court, and only one issue was decided.

While the state court did not decide the issue of whether the arbitration

---

[29] See also Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 421 F.2d 1313, 1319 (5th Cir. 1970) ("If a claim requires elements 1, 2 and 3 for recovery, summary judgment is proper if 2 is missing.  But this would not give to a summary judgment based thereon a perpetual cloak to forbid inquiry into 1 or 3, or both.  This would distort the wholesome policy behind collateral estoppel."); Gunnin v. Carlile, 25 S.E.2d 652, 653-54 (Ga. 1943) (holding that where defendant answered suit by both asserting title to land and denying allegations as to timber removal, general verdict in defendant's favor did not carry preclusive effect as to issue of defendant's title to land, for it "does not appear that the issue as to title was necessarily or actually determined, and it was incumbent upon her to remove the uncertainty and to show that this issue was actually determined in her favor, before she would be entitled to a verdict in the instant case upon the theory of res adjudicata [sic] or estoppel"); Sumner v. Sumner, 197 S.E. 833, 834 (Ga. 1938) (syllabus by the court) ("[T]here is an estoppel by judgment only as to such matters within the scope of the previous pleadings as necessarily had to be adjudicated in order for the previous judgment to be rendered, or as to such matters within the scope of the pleadings as might or might not have been adjudicated, but which are shown by aliunde proof to have been actually litigated and determined."); Hudgins v. Bawtinhimer, 395 S.E.2d 909, 911 (Ga. Ct. App. 1990) (holding that court order dismissing petition for involuntary commitment without specifying reason does not carry preclusive effect on issue of whether commitment process was defective, as court might have found that dismissal was warranted for other reasons, including finding that involuntary treatment was not needed).

50

agreement would have been enforceable in the counterfactual world in which the defendants did not commit discovery abuses, that issue did not need to be decided, because it was irrelevant. The defendants did commit discovery abuses. Thus, the only issue to be decided was whether the agreement was enforceable in spite of the discovery abuses. This issue the court explicitly and necessarily decided.

### 7.    On the Merits

It is not entirely clear whether Georgia law requires an "on the merits" inquiry for purposes of collateral estoppel.[30] Nonetheless, because the law is unclear, and because the Petitioners opposed Strong's collateral estoppel claim

---

[30] The term "on the merits" sometimes appears in Georgia case law as a collateral estoppel requirement. E.g., Body of Christ, 696 S.E.2d at 669 (requiring for collateral estoppel that "issue . . . had been resolved on the merits in prior litigation"); Waldroup, 463 S.E.2d at 7 ("Collateral estoppel precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies."); Powell v. Powell, 37 S.E.2d 191, 194 (Ga. 1946) ("Under both [res judicata and collateral estoppel], in order for the former decision to be conclusive, it must have been based, not merely on purely technical grounds, but at least in part on the merits where under the pleadings they were or could have been involved." (quoting Sumner, 197 S.E. at 834) (alteration added)). Other times it does not. E.g., Kent, 452 S.E.2d at 766 ("[C]ollateral estoppel applies where an issue of fact or law is actually litigated and determined by a valid judgment, and the determination is essential to the judgment." (emphasis omitted)). There is also evidence that Georgia courts view the "actually litigated" and "necessarily decided" requirements of collateral estoppel as already encompassing an especially stringent "on the merits" requirement. See, e.g., Piedmont Cotton Mills, Inc. v. Woelper, 498 S.E.2d 255, 256 (Ga. 1998) (contrasting claim preclusion, which requires that "merits were or could have been determined," with collateral estoppel, which "applies only to matters which were directly decided in the former action"); Waldroup, 463 S.E.2d at 8 (holding that prior judgment did not collaterally estop plaintiff's subsequent lawsuit because, "[w]hile [the previous] ruling was on the merits," the relevant issue was not "actually litigated and decided" in the first action); see generally In re Graham, 191 B.R. 489, 494-95 (Bankr. N.D. Ga. 1996) (stating that Georgia's "actually . . . litigated and determined" requirement "implicit[ly]" encompasses an "on the merits" inquiry).

51

specifically on the basis of the "on the merits" requirement, we will address this requirement out of an abundance of caution and treat it as a prerequisite to the operation of collateral estoppel.  Cash America argued in its briefing to this Court that the state-court order "is not a final merits decision on the enforceability of the arbitration agreement, [sic] instead it only strikes the defense of arbitration." (Petitioners' Mootness Resp. at 3.)  Thus, Cash America asserts, the state-court order "does not preclude another court from considering the merits of the arbitration issue on the basis of either res judicata or collateral estoppel because it did not reach the merits of the arbitrability issue."  (Id.)  We are unpersuaded.

The Georgia cases are clear that court orders dismissing claims or striking pleadings as a sanction for willful discovery violations function as an adjudication on the merits and carry res judicata effect.  See Brantley v. Sparks, 306 S.E.2d 337, 338 (Ga. Ct. App. 1983) (sanction of dismissal after finding of willful violation of discovery order operates as an adjudication on the merits); Morton v. Retail Credit Co., 196 S.E.2d 902, 902-03 (Ga. Ct. App. 1973) (holding that where discovery violation was willful, statutory sanctions of dismissal, default, or striking of pleadings operate as adjudication on the merits and carry res judicata effect); cf. Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 509 (2001) (stating in dicta that "dismissals for willful violation of discovery orders" should be accorded

"claim-preclusive effect" to preserve the rendering court's "interest in the integrity

of [its] own processes").

Georgia case law has explained that the on-the-merits requirement can be

satisfied even if the court does not pass directly on the substance of the claim:

> [A]n adjudication on the merits does not require that the litigation should be determined on the merits, in the moral or abstract sense of these words. It is sufficient that the status of the action was such that the parties might have had their suit thus disposed of, if they had properly presented and managed their respective cases. Thus, it is only where the merits were not <u>and</u> could not have been determined under a proper presentation and management of the case that res judicata is not a viable defense. If, pursuant to an appropriate handling of the case, the merits were <u>or</u> could have been determined, then the defense is valid.

Smith v. AirTouch Cellular of Ga., Inc., 534 S.E.2d 832, 836 (Ga. Ct. App. 2000)

(quoting Piedmont Cotton, 498 S.E.2d at 256).[31] Thus, it is clear that even if "on

---

[31] The Second Restatement of Judgments has similarly explained that the term "on the merits" does not necessarily mean that the court has evaluated the substance of the claim, because "[i]ncreasingly, . . . by statute, rule, or court decision, judgments not passing directly on the substance of the claim have come to operate as a bar." Restatement of Judgments § 19, cmt. a. The authors explained the reasons for this development this way:

> [C]onsiderations [of fairness and repose] may impose [preclusive effect] even though the substantive issues have not been tried, especially if the plaintiff has failed to avail himself of opportunities to pursue his remedies in the first proceeding, or has deliberately flouted orders of the court.
> The general rule stated in this Section requires that errors underlying a judgment be corrected on appeal or other available proceedings to modify the judgment or to set it aside, and not made the basis for a second action on the same claim.

Id.

53

the merits" adjudication is a prerequisite to collateral estoppel, such a requirement is satisfied by the state-court order in this case. The state court struck the Cash America defendants' arbitration defenses as a statutorily authorized sanction for repeated and flagrant discovery violations. The court specifically found the violations to be "deliberate[] and willful[]." And the court did not specify that its adjudication was <u>not</u> on the merits. <u>Cf.</u> Ga. Code Ann. § 9-11-41(b)-(c) (dismissal of a counterclaim operates as an adjudication on the merits unless court in its order specifies otherwise). Were the district court to order arbitration in this case in spite of the state-court order, it would render utterly nugatory the state court's sanction -- a sanction that was upheld on appeal and that the court was entitled by law to impose. <u>See</u> Ga. Code Ann. § 9-11-37(b)(2).

In sum, because Cash America's arbitration defenses were struck by the Georgia state court as a statutorily authorized sanction for their willful and deliberate discovery abuses, Cash America may not relitigate the issue of the arbitration clause's enforceability in federal court.[32]

---

[32] We acknowledge that this resolution creates an anomalous result, insofar as the same common nucleus of operative fact may be the subject of two separate proceedings in two separate fora -- a state-court lawsuit in Cobb County, Georgia and an arbitration proceeding in Atlanta, Georgia. However, this result follows directly from the Supreme Court's admonition that judicial concerns about "economy and efficiency" do not trump the importance of resolution in the proper forum. <u>Dean Witter Reynolds, Inc. v. Byrd</u>, 470 U.S. 213, 217 (1985) (quotation omitted). As the Court has said, "[t]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in

IV.

For the foregoing reasons, we AFFIRM the district court's dismissal of the FAA petition, on the alternative ground of issue preclusion, as to Cash America Financial Services, Inc., Cash America International, Inc., Georgia Cash America, Inc., and Daniel R. Feehan. However, we VACATE the order of dismissal as to Community State Bank, and REMAND to the district court to consider in the first instance the merits of the Bank's petition to compel arbitration.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

different forums." Id. And a panel of this Circuit has since explained that "[t]he corollary is that a court cannot shoehorn pendent non-arbitrable claims into arbitration based on 'its own views of economy and efficiency.'" Thomas v. Carnival Corp., 573 F.3d 1113, 1120 (11th Cir. 2009) (quoting Dean Witter, 470 U.S. at 217) (emphasis in original).