A07A0917. GEORGIA CASH AMERICA, INC. et al. v. STRONG et al.
(649 SE2d 548)

ELLINGTON, Judge.

The named defendants, Georgia Cash America, Inc., Cash America International, Inc., and Daniel Feehan (collectively, "GCA") appeal from the State Court of Cobb County's order holding them in contempt and striking their arbitration defenses in this contract case. In the same appeal, GCA also challenges two of the court's prior discovery orders, the violation of which served as the basis for its finding of contempt.[1] For the following reasons, we affirm.

The record shows the following relevant facts. GCA is a Georgia company which contracted with Community State Bank, a South Dakota bank, to offer "payday" loans in Georgia.[2] On August 6, 2004, the plaintiffs/appellees, each of whom borrowed money through the

---

[1] See *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 809 (1) (555 SE2d 175) (2001) (when a party appeals from a contempt order finding him in violation of a court order, the legal correctness of the underlying order may also be challenged on appeal).

[2] A payday loan [has been defined as] a loan of short duration, typically two weeks, at an astronomical annual interest rate. Payday loans are the current version of

payday loans,[3] filed suit against GCA alleging, among other things, conversion of funds through a predatory lending scheme, theft by deception, fraud, and conspiracy to offer loans that violated Georgia law.[4] The plaintiffs' loan documents identified the lender as "Community State Bank" of Milbank, South Dakota (hereinafter, "the bank"). The complaint alleged that GCA entered into a sham partnership with the bank in order to claim that it was only making loans on behalf of the bank and, thus, secure immunity from Georgia's usury laws on federal preemption grounds. According to the complaint, the bank had little involvement in the loans other than lending its name to the transaction and receiving a small portion of the loan proceeds, and it alleged that GCA, not the bank, was the de facto lender in the payday loans. The complaint alleged that, since Georgia companies are prohibited under Georgia law from making payday loans, the loan contracts in this case were null and void. The complaint also alleged that the loan contracts were unconscionable adhesion contracts and that the arbitration agreements contained in the contracts were unenforceable. The complaint did not assert any claims against the bank or under any federal law.

On September 7, 2004, GCA filed a notice of removal of the case to federal district court. The plaintiffs moved to remand the case to state court. While the case was still pending in federal court, however, GCA filed a motion to stay and to compel arbitration pursuant to the contracts' arbitration agreements. The plaintiffs requested limited discovery on the issue of whether the arbitration agreements were unenforceable due to procedural unconscionability and were unenforceable adhesion contracts. GCA opposed the request and raised

---

salary buying or wage buying. The fees, charges, and interest on a payday loan are between 15 percent and 30 percent of the principal for a two-week loan, constituting a pretext for usury. Because the maturity date of these loans is usually set to coincide with the borrower's next payday, the loans are often called "payday loans." (Citations and punctuation omitted.) *Clay v. Oxendine*, 285 Ga. App. 50, 51 (1) (645 SE2d 553) (2007). "In an attempt to circumvent state usury laws, some payday lenders have contracted with federally chartered banks or state chartered banks insured by the FDIC to take advantage of federal banking laws that allow such banks to make loans across state lines without regard to that state's interest and usury laws." (Footnote omitted.) *BankWest v. Oxendine*, 266 Ga. App. 771, 774 (1) (598 SE2d 343) (2004). See 12 USC § 1831d (a) (bank may, "notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section," charge interest at rate allowed by state where bank is chartered).

[3] For example, in February 2004, James Strong borrowed $200 for 25 days and agreed to pay a finance charge of $36, which equates to an annual interest rate of 263 percent. Another plaintiff, James Greene (added to the complaint later by amendment), took out at least 26 payday loans from May 2004 to June 2005 for amounts from $100 to $431 with finance charges that would equal interest rates ranging from 410 percent to 730 percent annually.

[4] Specifically, the complaint alleged that GCA violated OCGA § 7-3-1 et seq. (Georgia Industrial Loan Act); OCGA §§ 7-4-2 (a) (2) and 7-4-18 (a) (usury statutes); OCGA § 16-17-1 et seq. (payday lending statutes); OCGA § 7-1-709 et seq. (check cashing statutes); and OCGA § 16-14-1 et seq. (Georgia RICO Act).

numerous objections to the plaintiffs' discovery requests. On December 13, 2005, before discovery was completed on the issue of whether the arbitration agreements were enforceable, the federal court remanded the case back to the state court.

On April 4, 2006, the trial court conducted a hearing on GCA's pending motion to stay and to compel arbitration and on the plaintiffs' request for discovery on the issue of whether the arbitration agreements were unenforceable due to procedural unconscionability and fraud in the factum. The plaintiffs contended that the arbitration agreements in this case were fraudulent on their face and were part of a scheme to circumvent Georgia's usury laws by identifying the bank as the lender, even though, under Georgia law, GCA is the true lender because it is the entity which receives the predominant economic benefit from the loans. See OCGA §§ 7-4-2 (a) (2); 7-4-18 (a) (usury statutes); 16-17-1 et seq. (payday lending statutes).

In response, GCA complained that it had no notice that the plaintiffs were raising a fraud in the factum argument specifically as to the arbitration agreements and, because it was not prepared to fully address the argument at that time, asked for additional time to respond to the argument. Following the hearing, the court issued an order (hereinafter, "the April order") giving the parties until June 30, 2006, to conduct limited discovery on the factual issues relating to whether the arbitration agreements were subject to the defenses of fraud in the factum and procedural unconscionability. GCA did not seek a certificate of immediate review from the court's order, but filed a motion for reconsideration of the ruling and thoroughly briefed the fraud in the factum issue. The court denied the motion for reconsideration on May 26, 2006.

The plaintiffs sent GCA discovery requests which asked for corporate financial records, audit reports, and other documents; information about GCA's corporate structure; communications and contracts between GCA and the bank concerning the payday loans; information on GCA's payday loan customers in Georgia; marketing materials; and employee training materials. On June 13, 2006, GCA filed its objections to the discovery requests, raising the attorney-client privilege, the work product doctrine, and other privileges, and asserting that the discovery requests were overbroad and beyond the scope of the April order. It is undisputed that, when GCA filed its objections to discovery, it had not reviewed any of the requested documents to determine which ones were protected by the asserted privileges. When the plaintiffs' counsel requested that GCA provide a "privilege log" identifying specific documents that it was withholding, GCA's counsel refused. According to the plaintiffs' counsel, GCA told her it was not a "good use of [GCA's] time or money to review the requested documents" to determine the documents' status. According

to a letter from GCA to plaintiffs' counsel, "it was clear from the face of the [discovery] request that it could reasonably be read as seeking documents that are protected by one of the asserted privileges."

In response to GCA's failure to comply with the April order, the plaintiffs filed a motion asking the court to issue an order compelling GCA to produce the requested documents or, in the alternative, to find GCA in contempt of the April order and to sanction GCA by striking its arbitration defenses, pursuant to OCGA § 9-11-37 (b) (2). In their motion, the plaintiffs specifically contended that GCA had failed to make any showing to meet its burden of establishing that the requested documents were privileged under either the attorney-client or work product privileges. GCA did not move for an OCGA § 9-11-26 (c) protective order in response to the plaintiffs' motion to compel, but it did produce the documents that it believed were relevant to the plaintiffs' fraud and unconscionability claims.

During the July 7, 2006 hearing on plaintiffs' motion, GCA argued that the plaintiffs' discovery requests were overly broad and, because of the volume and nature of the documents that were requested, some of the requested documents must be privileged. GCA did not present evidence to demonstrate that any of the requested documents were privileged. The plaintiffs responded to the over-breadth argument by arguing to the court why the requests were relevant and likely to lead to admissible evidence.

Following the hearing, the court issued an order ("the July order") in which it found that "the identity of the true lender has been in issue from the very beginning of the case ... [and] is a matter which necessarily lends itself to extensive discovery of defendants' and [the bank's] documents and records, together with extensive discovery depositions of their agents and employees." Therefore, the court ruled that the scope and breadth of discovery would include not only the details of the relationship between the bank and GCA, but also the details of each loan purportedly made by the bank through GCA in Georgia. The court found that the plaintiffs' discovery requests were designed to obtain information concerning those details and, as a result, it ruled that the requests were not overbroad.

As to GCA's objections that some of the requested documents were privileged, the court ruled as follows:

It is defendants' burden to establish that any particular documents are in fact subject to the privileges claimed. . . . However, defendants submitted nothing to the court at the July 7 hearing to meet its burden. On the contrary, the court finds that defendants deliberately chose to not even review the documents or produce a privilege log as a first step toward meeting their burden in this regard. Defendants did

not file a protective order under OCGA § 9-11-26 (c) with respect to their claims of privilege and took a chance that the court would sustain their overbreadth objections before they would even begin the process of establishing those privileges, thereby attempting to give themselves a unilateral, indefinite extension on discovery. The court finds that defendants have failed to establish the asserted privileges, and the objections based thereon are overruled. All other objections asserted by defendants are without merit and are overruled.

The court then ordered GCA to produce all responsive documents by August 17, 2006, but it did not find GCA in contempt for its failure to comply with the April order. The court refused GCA's request for a certificate of immediate review of the July order.

GCA delivered some of the requested documents on August 16, 2006. A week later, after the discovery deadline had passed, GCA notified the plaintiffs that it was going to provide some of the remaining documents and a privilege log. GCA stated, however, that it would not produce any documents it considered privileged because it believed that the July order was not "sustainable" and, because the court did not allow it to file a discretionary appeal from the order, the only way it could "test that position" was by withholding the documents. The plaintiffs then filed a motion to hold GCA in contempt of the court's April and July orders.

At approximately 6:50 p.m. on September 29, 2006, the last business day before the October 2 hearing on the contempt motion, GCA delivered a privilege log and a compact disc that purported to hold about 39,000 pages of documents. Still, GCA withheld documents that it asserted were covered by the attorney-client privilege or the work product doctrine. Following the hearing, the court entered a comprehensive order ("the October order") in which it specifically found that, when GCA "served their objections based upon the attorney-client privilege, [it] did not know the identity of the documents, if any, to which [its] assertions of the attorney-client privilege would apply"; GCA "deliberately elected not to review [its] own documents" to determine to which the privilege would apply because it "believed it would be a waste of [its] resources"; the plaintiffs' June 20 motion to compel "clearly put [GCA] on notice that [its] objections based upon the attorney-client privilege would be in issue at the July 7 hearing"; even so, GCA did not conduct a review of its documents or prepare a privilege log prior to the July 7 hearing; and, as a result, GCA failed to carry its burden of establishing the attorney-client privilege at that hearing. The court also found that, even though it had ruled in July that GCA failed to establish the attorney-client

privilege, GCA continued to assert the privilege during the October contempt hearing. Finally, the court found that GCA failed to produce most of the requested documents until 6:30 p.m. on September 29, 2006, the last business day before the October 2 hearing and well after the August 17 due date. As a result, the court ruled that GCA "deliberately and willfully failed and refused to produce the documents which were subject to the April 18 and July 17 orders within the time set forth in those orders" and held GCA in contempt. As a sanction, the court struck GCA's arbitration defenses. This appeal followed.

1. GCA argues that the court erred in ordering it to produce discovery regarding the plaintiffs' "fraud in the factum" claim in its April order, contending that the plaintiffs did not raise this claim in their complaint, GCA had no notice of the claim before the April hearing, and GCA was not allowed to brief the claim before the court issued its order. We disagree.

The plaintiffs' complaint alleged that the agreement between GCA and the bank was a sham partnership that allowed GCA to participate in a fraudulent, predatory lending scheme offering illegal payday loans. The complaint also alleged that the payday loan contracts and the accompanying arbitration agreements fraudulently identified the bank as the lender when, in fact, the lender was GCA. Further, the record clearly shows that GCA thoroughly briefed its arguments regarding fraud in the factum in its motion for reconsideration of the court's April order. Given these circumstances, GCA's contentions that the court erred in finding that the plaintiffs failed to allege fraud in the factum in their complaint and that the court improperly denied GCA the opportunity to address the fraud in the factum allegation is not supported by the record.

2. GCA claims that the court did not properly review its objections that the plaintiffs' discovery requests were overbroad. It argues that, as a result, the court erred in ordering it to produce the requested documents because many of the documents requested were irrelevant to the plaintiffs' fraud in the factum claim, as well as to the claim that the arbitration agreements were unconscionable. According to GCA, a fraud in the factum claim requires a showing that there was a misrepresentation as to the character or essential terms of a proposed contract and the plaintiffs' claim fails to satisfy that requirement.

The plaintiffs' fraud claim, however, is based upon its contention that GCA, not the bank, is the true lender and, therefore, the arbitration agreements fraudulently misrepresented the identity of the true lender. Although GCA argues that the plaintiffs have failed to present a fraud in the factum claim because the identity of the

lender in this case is not an essential term of the agreements, GCA cites to no authority to support its contention.

Further, even though GCA objected to the requests as overbroad and, as a result, the plaintiffs filed a motion to compel discovery, GCA never moved for a protective order under OCGA § 9-11-26 (c). During the July hearing, the trial court heard arguments by the parties on GCA's overbreadth arguments. The court then specifically ruled that the plaintiffs' requests were relevant to determining the true identity of the lender, that the issue required extensive discovery of the records and documents of GCA and the bank, and that the plaintiffs' requests were designed to obtain information concerning the issue and were not overbroad.

"The trial courts have broad discretion to determine what is and what is not discoverable, and this [C]ourt will not interfere with those decisions absent a clear abuse." (Punctuation and footnote omitted.) *Dagel v. Lemcke*, 245 Ga. App. 243, 244 (2) (537 SE2d 694) (2000). The record does not support GCA's claim that the trial court failed to properly review its overbreadth objections to the plaintiffs' requests, nor does it show that the court abused its discretion in ordering GCA to produce the requested documents.

3. GCA complains that the trial court erred in failing to review its objections to discovery based upon the work product doctrine. There is no merit to this argument.

The trial court found that GCA failed to do any timely review of its documents to determine whether the documents were protected by any privilege and, as a result, GCA failed to meet its threshold burden of establishing that the documents it refused to produce were privileged. As a consequence, the court sanctioned GCA by striking its arbitration defenses. See Division 5, infra. In the October order, the court specifically noted that the sanction was the result of GCA's conduct with respect to those documents to which it had asserted the attorney-client privilege, as opposed to those documents that were allegedly protected by the work product or trial preparation privileges.

Consequently, because the court struck GCA's arbitration defenses, no further discovery was necessary in this case on the issue of the enforceability of the arbitration agreements. Therefore, GCA's work product protection objections to the arbitration-related discovery requests were rendered moot.

4. GCA contends the court erred in not reviewing its objections to discovery based upon the attorney-client privilege and in issuing an order to compel production of documents that implicated the privilege without considering the totality of the circumstances.

The burden is upon the corporation to establish that counsel's advice was privileged legal advice and thus not subject to discovery. In reaching this determination, the trial court should consider the totality of the circumstances. In addition to the requirement that an attorney-client relationship exists, relevant factors generally include, but are not limited to, the nature and purpose of the communication and how and to whom the communication was made.

(Citations omitted.) *Southern Guaranty Ins. Co. v. Ash*, 192 Ga. App. 24, 29 (383 SE2d 579) (1989). It is axiomatic that corporate communications must have remained confidential in order to be protected by the attorney-client privilege; in other words, the communications must not have been disclosed to anyone outside the corporation or to anyone within the corporation who was not authorized to receive them. Id. at 28. In addition,

the attorney-client privilege extends only to confidential communications made for the purpose of facilitating the rendition of *legal* services to the client. Thus, where the attorney acts merely as a business adviser[,] the privilege is inapplicable. The privilege would never be available to allow a corporation to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure. It seems well settled that the requisite professional relationship is not established when the client seeks *business or personal advice*, as opposed to legal assistance.

(Citations and punctuation omitted; emphasis in original.) *Southern Guaranty Ins. Co. v. Ash*, 192 Ga. App. at 28-29.

Although GCA claims the trial court did not consider the "totality of the circumstances" before finding that GCA had failed to establish that any of its documents were protected by the attorney-client privilege, GCA has not identified on appeal any circumstances that existed prior to the July hearing on the plaintiffs' motion to compel which might have changed the court's conclusion.

GCA suggests, however, that the trial court should have recognized from the "face" of the discovery requests that some of the requested documents might be protected by the attorney-client privilege. For example, GCA claims that the requests could be construed to seek drafts of agreements, reports and other documents exchanged between GCA and the bank which had been "reviewed" or "commented on" by its counsel and, therefore, were privileged. But GCA has failed to cite to any authority that would allow it to claim a blanket attorney-client privilege for all potentially protected yet

unidentified documents and thereby relieve it of its burden of making the threshold showings outlined above. Similarly, GCA's suggestion that the fact that an attorney might have reviewed or commented upon a document automatically protects the document under the attorney-client privilege is unsupported by any authority and, in fact, conflicts with prior opinions by this Court. See, e.g., *Southern Guaranty Ins. Co. v. Ash*, 192 Ga. App. at 28-29 (as quoted above).

Consequently, GCA's argument that the court did not consider the totality of the circumstances before ruling in July that GCA had failed to establish the attorney-client privilege is disingenuous and presents no basis for reversing the court's order.

5. GCA claims the court abused its discretion in striking its arbitration defenses because its actions were not wilful. GCA describes its failure to produce the documents as "involuntary noncompliance" with the order. It argues that, because the court refused to give them a certificate of immediate review from the July discovery order, it had no choice but to defy the court's order.

(a) Trial courts are granted a very broad discretion in applying sanctions against a disobedient party when the party disobeys an order to produce, and this Court will not interfere with the exercise of that discretion absent abuse. *Loftin v. Gulf Contracting Co.*, 224 Ga. App. 210, 214-215 (3) (480 SE2d 604) (1997). Under OCGA § 9-11-37 (b) (2), a court may sanction a party for failing to comply with a court order compelling discovery by, inter alia, striking pleadings or defenses, issuing a default judgment, or dismissing a complaint. In addition to these sanctions, the court may also hold the party in contempt. OCGA § 9-11-37 (b) (2) (D).

> The defenses to both civil and criminal contempt are that the order was not sufficiently definite and certain, was not violated, or that the violation was not wilful. The question of whether a contempt has occurred is for the trial court, and its determination will be overturned only if there has been a gross abuse of discretion. Therefore, if there is any evidence to support the trial court's determination that a party has wilfully disobeyed its order, the court's finding of contempt will be affirmed on appeal.

(Citations and punctuation omitted.) *Folds v. Barber*, 279 Ga. App. 671, 672-673 (632 SE2d 403) (2006). A party may demonstrate that an opposing party wilfully violated a court order by showing that party's "conscious or intentional failure to act, as distinguished from an accidental or involuntary non-compliance. A conscious or intentional failure to act is in fact wilful." (Citations and punctuation omitted.) *Loftin v. Gulf Contracting Co.*, 224 Ga. App. at 215 (3).

Moreover, as long as the trial court has jurisdiction to issue an order, "it must be obeyed however wrong it may be until the order is superseded or vacated." (Punctuation and footnotes omitted.) *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. at 809 (1).

In this case, as the trial court found, during the period between the April order and the July hearing on the plaintiffs' motion to compel, GCA's counsel deliberately chose not to review the requested documents. Further, GCA did not file a motion for a protective order under OCGA § 9-11-26 (c). According to the court, GCA instead "took a chance that the court would sustain [its] overbreadth objections before [it] would even begin the process of establishing those privileges, thereby attempting to give [itself] a unilateral, indefinite extension on discovery." After the court ruled in July that the requests were not overbroad, that GCA had failed to establish the asserted privileges, and that GCA was required to provide the requested documents by August 17, GCA still provided only a small portion of the documents before the deadline. It continued to intentionally withhold some documents based upon its contention that the discovery requests were overbroad and that the court's ruling on that issue was not "sustainable." Clearly, GCA's strategic decision to withhold the documents in order to "test [its] position" constituted a conscious and deliberate failure to comply with the court's orders. See *Loftin v. Gulf Contracting Co.*, 224 Ga. App. at 215 (3).

Consequently, the record supports the court's finding that GCA "deliberately and willfully failed and refused to produce the documents which were the subject of the April 18 and July 17 orders within the time set forth in those orders." See *Folds v. Barber*, 279 Ga. App. at 672-673 (any evidence standard). Therefore, the court did not abuse its discretion in sanctioning GCA under OCGA § 9-11-37 by striking its arbitration defenses. See *Swindell v. Swindell*, 233 Ga. 854, 857 (3) (213 SE2d 697) (1975) (court did not abuse its discretion in striking the appellant's defenses when appellant did not begin making a diligent effort to comply with discovery until after the discovery deadline had passed and appellee had filed a motion to compel).

(b) Moreover, there is no merit to GCA's claim that it had no other choice but to violate the July order compelling discovery in order to protect the privileged documents. A party's failure to comply with discovery will not be excused on the ground that the discovery sought is objectionable unless the party applied for a protective order under OCGA § 9-11-26 (c). OCGA § 9-11-37 (d) (2). It is undisputed that GCA never asked for a protective order in this case, even after the plaintiffs filed a motion to compel discovery based upon the April order.

GCA argues, however, that it was not required to seek a protective order because it partially responded to the plaintiffs' discovery

requests. It contends that it was required either to respond or to seek a protective order, but not both. But under OCGA § 9-11-37 (a) (3), "an evasive or incomplete answer is to be treated as a failure to answer." After receiving GCA's incomplete response to discovery, the plaintiffs filed a motion to compel under OCGA § 9-11-37, which the court granted after conducting a hearing.

Therefore, because GCA never moved for a protective order, but instead chose to violate the court's orders compelling discovery by withholding documents it claimed were objectionable, its failure to comply with the discovery orders was not excused. OCGA § 9-11-37 (d) (2).

*Judgment affirmed. Adams, J., concurs. Andrews, P. J., concurs in the judgment only.*

DECIDED JULY 6, 2007 — 

*Paul, Hastings, Janofsky & Walker, John G. Parker,* for appellants.

*Roy E. Barnes, Jennifer A. Jordan,* for appellees.