**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 6, 2012**

# In the Court of Appeals of Georgia

A12A1015. GEORGIA CASH AMERICA, INC. et al. v. GREENE et al.

BOGGS, Judge.

This is the fourth appearance of this case before this court. The appellants, Georgia Cash America, Inc. and its president and CEO, Daniel Feehan (collectively "Cash America"), appeal from the trial court's denial of their motion for summary judgment and its grant of the plaintiffs' motion for partial summary judgment. The main issue before us on appeal is whether Cash America was the "de facto" lender of payday loans made to the plaintiffs. For the following reasons, we affirm in part and reverse in part.

The underlying facts of this case are as set forth in our prior opinion involving the same parties:

[Cash America] is a Georgia company which contracted with Community State Bank, a South Dakota bank,[1] to offer "payday" loans in Georgia. On August 6, 2004, the plaintiffs/appellees, each of whom borrowed money through the payday loans, filed suit against [Cash America] alleging, among other things, conversion of funds through a predatory lending scheme, . . . to offer loans that violated Georgia law.[2] The plaintiffs' loan documents identified the lender as "Community State Bank" of Milbank, South Dakota (hereinafter, "the bank"). The complaint alleged that [Cash America] entered into a sham partnership with the bank in order to claim that it was only making loans on behalf of the bank and, thus, secure immunity from Georgia's usury laws on federal preemption grounds. According to the complaint, the bank had little involvement in the loans other than lending its name to the transaction and receiving a small portion of the loan proceeds, and it alleged that [Cash America], not the bank, was the de facto lender in the payday loans. The complaint alleged that, since Georgia companies are prohibited under Georgia law from making payday loans, the loan contracts in this case were null and void. The complaint also alleged that the loan contracts were unconscionable adhesion contracts and that the arbitration agreements contained in the contracts were unenforceable.

---

[1]From sometime in 2000 to March 2003, Cash America contracted with "First National Bank in Brookings." Beginning in March 2003, Cash America entered into similar agreements with Community State Bank. For simplicity, we will refer to both of these entities as "the bank."

[2]The fourth amended and restated complaint filed in 2009 alleged violation of the Georgia Industrial Loan Act, usury, violation of SB 157, violation of the check cashing statute, violation of the Georgia RICO Act, conversion, and conspiracy.

2

The complaint did not assert any claims against the bank or under any federal law.

(Footnotes omitted.) *Georgia Cash America v. Strong*, 286 Ga. App. 405, 405-406 (649 SE2d 548) (2007) (physical precedent only), cert. denied, 2007 Ga. LEXIS 709.

In *Strong*, the first appearance of this case, we affirmed a trial court order holding Cash America in contempt for discovery violations and striking its arbitration defense. Id. at 405-415. Cash America nevertheless moved to compel arbitration. The trial court denied the motion and Cash America filed an appeal in this court, but we dismissed the appeal for lack of jurisdiction.

The plaintiffs subsequently sought class action certification to represent the interests of all Cash America borrowers in Georgia. The trial court granted certification, and Cash America appealed. This court affirmed the grant of class certification in an unpublished opinion pursuant to Court of Appeals Rule 36 (1) - (4).[3]

---

[3]These parties have also appeared repeatedly in federal court. Cash America filed a notice of removal of the case to federal district court, and filed a motion to stay and a motion to compel arbitration, but the federal court remanded the case back to the state court. *Strong*, supra, 286 Ga. App. at 406-407. For a full procedural history of this case in federal court, see *Community State Bank v. Strong*, 651 F3d 1241, 1247-1248 (11th Cir. 2011), cert. denied, 2012 U. S. LEXIS 7369 (Oct. 1, 2012).

In the case before us, Cash America moved for summary judgment on all of the plaintiffs' claims. The plaintiffs opposed Cash America's motion and moved for partial summary judgment on the ground that Cash America was the de facto lender "for all payday loans made between October 1, 2001 through May 1, 2004," and that Cash America's collection of unlawful debt was a racketeering activity under the Georgia RICO Act. Following the argument of counsel in two separate hearings, the trial court denied Cash America's motion for summary judgment and granted the plaintiffs' motion for partial summary judgment.

1. Cash America first argues that the trial court erred in denying its motion to compel arbitration as moot. In the first appearance of this case, this court held that the trial court did not abuse its discretion in striking Cash America's arbitration defenses as a sanction under OCGA § 9-11-37. *Strong*, supra, 286 Ga. App. at 413-414 (5) (a). Cash America nevertheless moved to compel arbitration pursuant to the terms of the loan documents. The trial court ruled that its prior order, from which Cash America appealed in *Strong,* rendered the motion to compel moot.

The plaintiffs argue that the trial court's earlier ruling striking Cash America's arbitration defense was an adjudication on the merits and carries a res judicata effect. We agree. In *Strong*, supra, we held that "because the court struck [Cash America's]

4

arbitration defenses, no further discovery was necessary in this case on the issue of the enforceability of the arbitration agreements." Id. at 411 (3). Similarly, Cash America cannot move to compel an action that the trial court foreclosed as a penalty. In striking Cash America's arbitration defense, the trial court essentially ruled that Cash America could not compel arbitration. And this court's affirmance of that ruling is binding in all subsequent proceedings. See OCGA § 9-11-60 (h) ("any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be"); see also *Maree v. Phillips*, 274 Ga. 369, 370-371 (3) (552 SE2d 837) (2001); *Strong*, supra, 651 F3d at 1265-1270 (III) (C) (1-7) (holding that only issue to be decided was whether the arbitration agreement was enforceable in spite of the discovery abuses; "Georgia cases are clear that court orders dismissing claims or striking pleadings as a sanction for willful discovery violations function as an adjudication on the merits and carry res judicata effect [Cit.]" Id. at 1270 (III) (C) (7)). This claim of error is therefore without merit.[4]

---

[4]Cash America argues that the decision of the United States Supreme Court in *AT&T Mobility LLC v. Concepcion*, ___ U . S. ___ (131 SC 1740, 179 LE2d 742) (2011), demands a different result. But the issue before the court in *Concepcion* was whether the Federal Arbitration Act prohibited states from finding arbitration agreements unconscionable and unlawfully exculpatory because those agreements

2. In two enumerations, Cash America contends that the trial court erred in its rulings on the parties' cross motions for summary judgment. "On appeal from the grant or denial of summary judgment, we apply a de novo standard of review." (Citation omitted.) *Coca-Cola Bottlers' Sales &c. v. Novelis Corp.*, 311 Ga. App. 161 (715 SE2d 692) (2011). "The moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Punctuation omitted.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); see also OCGA § 9-11-56 (c).

As explained in *Strong*,

[a] payday loan has been defined as a loan of short duration, typically two weeks, at an astronomical annual interest rate. Payday loans are the current version of salary buying or wage buying. The fees, charges, and interest on a payday loan are between 15 percent and 30 percent of the principal for a two-week loan, constituting a pretext for usury. Because the maturity date of these loans is usually set to coincide with the borrower's next payday, the loans are often called "payday loans."

disallowed class-wide arbitration procedures. 131 SC at 1744. That issue is not presented here.

6

(Citations and punctuation omitted.) *Strong*, supra, 286 Ga. App. at 406 n.2. Payday

loans $3,000 or less come within the scope of the Georgia Industrial Loan Act

("GILA"), OCGA § 7-3-1 et seq. *USA Payday Cash Advance Centers v. Oxendine*,

262 Ga. App. 632, 633 (585 SE2d 924) (2003). The purpose of the Act is "to define

and prevent usury." (Citation and footnote omitted.) Id. at 634. Usury is defined as

"reserving and taking or contracting to reserve and take, either directly or indirectly,

a greater sum for the use of money than the lawful interest." OCGA § 7-4-1. GILA

> was enacted to provide a source of regulated loans "for those who had
> been borrowing at usurious [interest] rates from loan sharks, street
> shylocks and wage-buyers." GILA applies to all "persons," defined as
> "individuals, copartnerships, associations, corporations, and all other
> legal and commercial entities," engaged in the business of making loans
> in amounts of $3,000 or less, unless such persons are expressly
> exempted. State or federally chartered banks are excluded from
> regulation under GILA and exempted from the operation of its
> provisions.

(Citations and footnoted omitted.) *BankWest v. Oxendine*, 266 Ga. App. 771, 772-773

(1) (598 SE2d 343) (2004). Both GILA and this state's usury statutes regulate lending

practices. For example, OCGA § 7-4-2 defines the legal rate of interest for purposes

of the usury statutes. And GILA provides: "A licensee may charge, contract for,

7

receive, and collect interest at a rate not to exceed 10 percent per annum of the face amount of the contract." OCGA § 7-3-14 (1). "If the maximum interest rate is over the limit set by OCGA § 7-3-14 of ten percent or the lender fails to hold an industrial license issued by the Commissioner, then 'payday loans' violate GILA." (Citation, punctuation and footnote omitted.) *Clay v. Oxendine*, 285 Ga. App. 50, 52 (1) (645 SE2d 553) (2007).

As noted by this court,

[i]n an attempt to circumvent state usury laws, some payday lenders have contracted with federally chartered banks or state chartered banks insured by the FDIC to take advantage of federal banking laws that allow such banks to make loans across state lines without regard to that state's interest and usury laws in "rent-a-charter" or "rent-a-bank" contracts.

(Citations omitted.) *USA Payday Cash Advance Centers*, supra, 262 Ga. App. at 634.

In 2004, the legislature addressed this practice and enacted SB 157, codified as OCGA § 16-17-1 et seq. (hereinafter referred to as "The Payday Lending Act"). OCGA § 16-17-1 provides in part:

(c) The General Assembly has determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions or to cause these transactions to appear to be "loans"

8

made by a national or state bank chartered in another state in which this type of lending is unregulated, even though the majority of the revenues in this lending method are paid to the payday lender. The General Assembly has further determined that payday lending, despite the illegality of such activity, continues to grow in the State of Georgia and is having an adverse effect upon military personnel, the elderly, the economically disadvantaged, and other citizens of the State of Georgia. The General Assembly has further determined that substantial criminal and civil penalties over and above those currently existing under state law are necessary in order to prohibit this activity in the State of Georgia and to cause the cessation of this activity once and for all. *The General Assembly further declares that these types of loans are currently illegal and are in violation of Code Section 7-4-2. The General Assembly declares that the use of agency or partnership agreements between in-state entities and out-of-state banks, whereby the in-state agent holds a predominant economic interest in the revenues generated by payday loans made to Georgia residents, is a scheme or contrivance by which the agent seeks to circumvent Chapter 3 of Title 7, the "Georgia Industrial Loan Act," and the usury statutes of this state.*

. . .

(e) Without limiting in any manner the scope of this chapter, the General Assembly declares that it is the general intent of this chapter to reiterate that *in the State of Georgia the practice of engaging in activities commonly referred to as payday lending, deferred presentment services, or advance cash services and other similar activities are currently*

*illegal* and to strengthen the penalties for those engaging in such activities.

(Emphasis supplied.) OCGA § 16-17-2 (b) (4) provides in part: "A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan."

The plaintiffs' claims here were divided into two categories based upon the effective date of the Payday Lending Act: loans made before May 14, 2004 and those made after May 14, 2004.[5] Their complaint alleged that Cash America was the lender of payday loans both before and after the passage of the Act. In ruling on the cross-motions for summary judgment, the trial court found that there was no genuine issue of material fact that Cash America was the true, or de facto, lender prior to May 14, 2004, and that a jury issue remained as to whether Cash America was the de facto lender after May 14.

_____

[5]While the Payday Lending Act became effective May 1, 2004, Cash America and other banks and payday lending institutions moved to enjoin enforcement of the new law. *BankWest v. Baker*, 324 FSupp.2d 1333, 1338 (ND Ga. 2004). The federal district court ultimately denied the motion, id. at 1339, but did grant a temporary restraining order restraining enforcement of the Act until May 15, 2004, while the court considered the "voluminous filings submitted by the parties." Id.

*Loans Before May 14, 2004*

(a) Cash America argues that the trial court erred in finding as a matter of law that it was the de facto lender of the payday loans prior to May 14, 2004. It argues that because "the loan documents identify the Banks as the lenders[,] the Banks approved the loans[,] the Banks funded the loans[,] and the checks were made payable to the Banks," the Banks were the true lenders. Cash America argues further that, prior to the enactment of the Payday Lending Act, the "'bank model' did not violate Georgia law, regardless of the proportion of loan revenues retained by the loan servicing agent." The plaintiffs, on the other hand, argue that Cash America's relationship with the Banks was a sham, and that the evidence shows that Cash America retained the predominant economic interest in all loan revenues generated through May 2004.

In granting the plaintiffs' motion for partial summary judgment on this issue, the court found that Cash America was the true lender of the loans because it retained 88 percent of the gross revenues of the loans, was required to provide initial funding for the loans and bear the expenses of marketing, originating and processing the loans, was required to indemnify the bank for any claims asserted by borrowers or regulatory authorities, was required to immediately repurchase any loan in default,

11

and was required to pay the bank a monthly fee. The court concluded: "In short, Cash America retained virtually all the benefits, risks and revenues of the loans and was responsible for virtually all the expenses and liabilities."

Cash America argues that prior to the enactment of the Payday Lending Act, "Georgia law did not regulate (1) the interest rates charged by out-of-state banks operating in Georgia, or (2) the activities of the in-state loan servicing agents for out-of-state banks." But if Cash America was the lender in fact rather than the banks, it was bound by GILA and this state's usury laws.

> To determine if a contract is usurious, we critically examine the substance of the transaction, regardless of the name given it, or, stated another way, the theory that a contract will be usurious or not according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous. The law intends that a search for usury shall penetrate to the substance.

(Citations and footnotes omitted.) *BankWest*, supra, 266 Ga. App. at 776 (2). And "where the profit received by the lender, by whatever name it may be called, and whether lawful on its face or not, is in reality a contrivance or device to obtain an amount greater than lawful interest, and is made with intent to violate the usury laws, the transaction is illegal, and . . . the name by which it is called is altogether

12

immaterial." (Citations omitted.) *Tribble v. State*, 89 Ga. App. 593, 596 (2) (80 SE2d 711) (1954).

We agree that the trial court was authorized in ruling on summary judgment to look outside of the written agreements between Cash America and the bank to ascertain the substance of the transaction. See, e. g., *BankWest*, supra, 266 Ga. App. at 773 (1) (to discover violation, industrial loan commissioner may examine the books, accounts and records of any person making loans of $3,000 or less). But we disagree, however, that the court could decide here as a matter of law, in light of the evidence presented, that Cash America was the true lender of the loans made prior to May 2004.

Some of the administrative service agreements ("ASAs") between Cash America and the bank provided that the bank was the lender and that Cash America was to administer, service, and collect the loans. The bank's duties pursuant to the ASAs included developing credit and underwriting criteria, making a determination as to whether to extend a loan, extending credit in the form of loans, funding the loans, and disbursing the proceeds of the loans. According to these agreements, Cash America's duties included marketing and promoting the loans, soliciting potential borrowers, overseeing and administering the application process, transmitting loan

13

applications to the bank, receiving decisions concerning the loan application and forwarding the decisions to the applicants, assisting the bank in the disbursement of the loan proceeds to the borrowers, and servicing the loans and forwarding them to the bank. The ASAs provided further that the loan payments belong to and would be held in trust for the bank and were not to be deposited in any account with Cash America funds. Cash America also agreed to indemnify and hold the bank harmless for any claims arising out of its breach *and* any claim that the "Loans or the activities of the parties hereunder are illegal under or prohibited by any of the Rules and any other claim asserted by or on behalf of Borrowers or a Regulatory Authority with respect to the Loans."

The loan applications listed the bank as the lender and contained an acknowledgment to be signed by the applicant that he/she understood that the application was for a loan from the bank. The promissory notes listed the bank as the lender, and the "Additional Terms" section contained an acknowledgment that Cash America was to "assist with this loan transaction" and would accept payments on the loan to forward to the bank. The promissory notes also provided that Cash America did not have the authority to make or review loans.

14

In contrast, the evidence showed that Cash America advanced the funds for the loans to customers "on behalf of the bank," and "at the end of the day, there would be an exchange with the bank where the bank would transfer" the funds back to Cash America in settlement.[6] The ASAs provided that Cash America would assume the responsibility for collecting all unpaid loans and agreed to purchase such loans from the bank. And while Cash America indemnified the bank from all claims that the parties' activities are illegal, the bank agreed to indemnify Cash America for only its breach or the breach of a third party servicer it retained. An exhibit labeled "Payday Loan Pricing" provided that the "loans will be priced at eighteen (18%)," and contained an "annual percentage rate calculation."[7] In a separate "Participation

---

[6]The ASAs provided that the parties would settle all amounts on a daily basis and that any payment due from one party to the other would be made by an automatic clearinghouse transfer on the next business day following the transaction. The agreements provided further: "Bank acknowledges and agrees that if it issues its draft to a Borrower for the disbursement of Loan proceeds to that Borrower and Cash America then honors that draft, the amount of the draft shall be considered due and owing from Bank to Cash America on the date that Cash America honors the draft."

[7]The example calculation was as follows:

$200.00 principal at 18% = $36 finance charge

APR = [(finance charge/principal)] X 100] X [365/loan term]

= [($36/$200.00) X [365/14]

= [0.18 X 100] X [26.0174]

= 18 X 26.0174

= 469.285 Annual Percentage Rate

15

Agreement" that was "for the purpose of effectuating the sale of an undivided participation interest in the Loans from the [bank]," the bank agreed to sell to Cash America "an undivided ninety-five percent (95%) interest in the Loans, together with corresponding interest in any collateral and all related Loan documents . . . The [bank] also agrees to offer and sell to [Cash America] the [bank's] remaining interest in Mature Loans [purchased by Cash America]." These two "interests" were referred to as "Participation Interest." These agreements provided that in consideration of Cash America's "Participation Interest," Cash America would be entitled to receive a "Participation Payment" equal to 8 percent per annum times the aggregate principal amount of the "Participation Interest." The "Participation Payment" was "paid to [Cash America] on a daily basis and shall equal (1) the aggregate principal balance of the Participation Interest as of the end of the preceding day times (2) .08 divided by (3) 365."

Cash America's compensation for its services under the ASAs was an "Administrative Fee" due each day equal to "(i) the Base Fee . . . for that day *minus* (ii) the Participation Payment payable to [Cash America] for that day under the Participation Agreement." The "Base fee . . . is the amount determined by multiplying

16

.864 times the Gross Revenues earned by [the] [b]ank for the given day."[8] Cash America also received from the bank a "Collection Bonus" based upon the loans made during a month that were repaid in full or renewed.

Daniel Feehan, president and CEO of Cash America, testified that Cash America acted as a servicer for the bank because it could not operate profitably in Georgia "because of the interest rate that could be charged." He stated further that Cash America acted as a direct lender in the majority of the states in which it operated, and that in Georgia (and six other states) it acted only as a marketer or servicer because "[t]he existing laws in the state of Georgia did not allow us to directly make short-term cash advances out of our store-front operations."

While the ASAs and loan documents provided that the bank was the lender, there was evidence that Cash America provided the funds for the loans, assumed the risk of loss of the loans, indemnified the banks for claims of illegality in the transactions, acted as a lender in other states, serviced loans with an interest rate higher than that statutorily allowed by a Georgia lender, received a 95 percent interest in the loans, was required to purchase all unpaid loans, and received between 75 and

---

[8]With regard to the ASAs between First National Bank in Brookings and Cash America between 2001 and 2003, this amount was 88 percent of gross revenues.

95 percent of revenues as compensation for its services. Under this evidence, a jury issue remains as to whether Cash America sought to obtain an amount greater than lawful interest prior to May 2004 and was therefore the true lender. Indeed, "the question whether one intended to exact usury under cover of a contrivance or device, . . . is for the jury to determine." (Citation and punctuation omitted.) *Tribble*, supra, 89 Ga. App. at 596-597 (2). The trial court therefore erred in granting the plaintiffs' motion for partial summary judgment that Cash America was the lender prior to May 2004. See, e. g., *BankWest*, supra, 266 Ga. App. at 775 (1) (investigation warranted when servicer received majority of fee or interest on each loan, retained risk of loss on loans, indemnified bank for claims relating to loans and bank did not reciprocate indemnification, and offered its own loans in other states but affiliated with out-of-state banks in states where payday lending illegal); see also *Aleman v. Sugarloaf Dialysis*, 312 Ga. App. 658, 660 (1) (719 SE2d 551) (2011) ("[c]onflicts in the evidence are to be resolved by the jury").

*Loans After May 14, 2004*

(b) Cash America argues that the trial court erred in failing to find as a matter of law that the banks were the lenders *after* May 14, 2004,[9] because it did not retain a predominant economic interest in the loan revenues after that date. Cash America argues further that because the bank was the "true lender," Cash America fell into the "safe harbor" provision of OCGA § 16-17-2 (b) (4) as the bank's agent.

> Entities exempt under OCGA § 16-17-2 (a) (3) may legally make payday loans in Georgia through a local agent provided that the agent is not the "de facto" lender, as established where "the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan." OCGA § 16-17-2 (b) (4).

*Glenn v. State*, 282 Ga. 27, 28 (1) n.4 (644 SE2d 826) (2007).

Feehan averred that after May 14, 2004, Cash America did not receive more than 49 percent of loan revenues in compensation, and the record reveals that after May 14, 2004, the ASAs between Cash America and the bank were amended to provide that Cash America would not receive more than 49 percent of revenue to

---

[9]Cash America ceased its payday lending operations in Georgia on April 1, 2006.

ensure that Cash America's compensation for its services is "less than a predominant economic interest in the revenues generated by the Georgia Loans, within the meaning of the New Georgia Law." The remaining provisions of the agreements essentially remained the same, however, including the calculation of the base fee at .864 time revenue (plus "the amount determined by multiplying .25 times the Gross Revenues earned by the [b]ank with respect to Georgia Loans for the given day.") The amendment to the ASAs provided that

> [i]f a court of competent jurisdiction makes a determination that the Administrative Fee provided for in this section . . . for services provided by Cash America in connection with Georgia Loans [results in a predominant economic interest in the revenues generated], the parties agree that the Adminstrative Fee payable for the services provided . . . shall be adjusted retroactively to an amount which is less than a predominant economic interest in the revenues.

The trial court concluded that the "factors which applied through May 14, 2004, for the most part continued to remain in place after May 14, 2004," and that an issue of fact remained as to whether Cash America's economic interest in the revenues was actually limited to 49 percent of revenues. As the trial court noted, Cash America attempted to limited its role to the language of the service agreements. But under OCGA § 16-17-6,

20

*the trial court shall be authorized to review the terms of the transaction in their entirety in order to determine if there has been any contrivance, device, or scheme used by the lender in order to avoid the provisions of subsection (a) of Code Section 16-17-2.* The trial court shall not be bound in making such determination by the parol evidence rule or by any written contract but shall be authorized to determine exactly whether the loan transaction includes the use of a scheme, device, or contrivance and whether in reality the loan is in violation of the provisions of subsection (a) of Code Section 16-17-2 based upon the facts and evidence relating to that transaction and similar transactions being made in the State of Georgia. If any entity involved in soliciting or facilitating the making of payday loans purports to be acting as an agent of a bank or thrift, then the court shall be authorized to determine whether the entity claiming to act as agent is in fact the lender. *Such entity shall be presumed to be the lender if, under the totality of the circumstances, it holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan.*

(Emphasis supplied.)

While Cash America amended the ASAs to provide that its intention was for its total compensation to be less than a predominant economic interest such that it could not be *presumed* to be the lender, there was other evidence presented, as outlined in Division 2 (a), sufficient to create a genuine issue of material fact regarding whether Cash America actually received a 49 percent economic interest for

21

its services and even if it did so, whether it nevertheless, by contrivance, device, or scheme, attempted to avoid the provisions of subsection (a) of Code Section 16-17-2. The trial court therefore did not err in concluding that genuine issues of material fact exist as to whether Cash America was the true lender of the loans made after May 14, 2004. See *BankWest*, supra; *Aleman*, supra.

3. In its remaining claim of error, Cash America argues that the trial court erred in denying its motion for summary judgment as to the personal liability of Feehan. Cash America argues that Feehan was not "directly involved with the torts alleged" and "merely executed the various administrative service agreements and related documents with [the bank] in his corporate capacity." The trial court found that a genuine issue of material fact remained regarding the claims against Feehan individually. The court reasoned that a jury could find that Feehan "personally was actively and directly involved in designing, creating and administering a scheme which resulted in the wrongdoing set out in plaintiffs' claims in this case."

> A corporation possesses a legal existence separate and apart from that of its officers and shareholders so that the operation of a corporate business does not render officers and shareholders personally liable for corporate acts. A corporate officer who takes part in the commission of a tort by the corporation is personally liable therefor, but an officer of a corporation who takes no part in the commission of a tort committed by

22

the corporation is not personally liable unless he specifically directed the particular act to be done or participated or cooperated therein (or if he disregarded the corporate form so as to authorize piercing of the corporate veil).

(Citations and punctuation omitted.) *Clay*, supra, 285 Ga. App. at 57 (3); see *BTL COM Ltd. v. Vachon*, 278 Ga. App. 256, 260 (1) (628 SE2d 690) (2006).

Feehan averred that he "never personally entered into a loan agreement," and "never personally determined the rate of interest to be charged on a loan." But the record reveals that in March 2000, Feehan submitted letters to the bank proposing the terms of one of the ASAs which included compensation to Cash America in the form of an administrative fee of 75 percent of gross revenues, and also signed various other ASAs which provided administrative fees payable to Cash America of between 86 and 88 percent. Feehan also admitted in his deposition that Cash America chose to use the bank because it could not profit in Georgia due to the interest rate cap.

Here, there was evidence that Feehan was "personally and intimately involved in drafting and negotiating the [ASAs]." *BTL COM Ltd.*, supra, 278 Ga. App. at 260 (1). And we have held in Division 2 that a jury issue remains concerning whether Cash America was the true lender. For these reasons, and in light of fact that the plaintiffs' tort claims remain pending below for a jury determination, the trial court

did not err in denying the motion for summary judgment as to Feehan's personal liability for a corporate tort. See id. at 260 (1); see also *Clay*, supra, 285 Ga. App. at 57 (3).

*Judgment affirmed in part and reversed in part. Doyle, P. J. and Andrews, J., concur.*